UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

**TARYN ASHER,**

      Plaintiff,

v.

      Case No. 2:26-cv-11820
      Hon.

**FOX TELEVISION STATIONS, LLC,**
and **NEW WORLD COMMUNICATIONS
OF DETROIT d/b/a WJBK-TV,** jointly and
severally,

      Defendants.

_____/

SOMMERS SCHWARTZ, P.C.
Matthew L. Turner (P48706)
Tad T. Roumayah (P74081)
Nathan A. Robbins (P87794)
Attorneys for Plaintiff
One Towne Square, Suite 1700
Southfield, Michigan 48076
(248) 355-0300
mturner@sommerspc.com
troumayah@sommerspc.com
nrobbins@sommerspc.com

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES Plaintiff, Taryn Asher ("ASHER"), by and through her attorneys, Sommers Schwartz, P.C., and for her Complaint against Defendants, Fox Television Stations, LLC and New World Communications of Detroit d/b/a WJBK-TV (hereinafter collectively referred to as "FOX"), states as follows:

1

## PARTIES

1. Plaintiff, ASHER, is an individual who resides in the City of Birmingham, Oakland County, State of Michigan.

2. Defendant, Fox Television Stations, LLC ("Fox TV"), is incorporated in the State of Delaware and maintains its principal place of business in the City of Los Angeles, Los Angeles County, State of California.

3. Defendant, New World Communications of Detroit d/b/a WJBK-TV ("NWCD"), is incorporated in the State of Delaware and maintains its principal place of business in the City of Southfield, Oakland County, State of Michigan.

## JURISDICTION

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

5. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they originate from the same facts that form the basis of her federal claims.

6. This Court has personal jurisdiction over Defendants because Defendants conduct business within the state of Michigan and employed Plaintiff and other individuals within the state of Michigan.

7. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391 because Defendants employed Plaintiff in this District, Defendants conduct business

2

in this District, and the actions and omissions giving rise to the claims pled in this Complaint substantially occurred in this District.

## GENERAL ALLEGATIONS

8. ASHER holds a Journalism degree from Michigan State University.

9. ASHER has devoted the majority of her professional journalistic career to FOX and dutifully served as News Anchor on FOX's "Fox 2 Detroit" news program since 2007.

10. ASHER has been a trusted and beloved fixture of the Metro Detroit community for many years and has received numerous accolades and awards for her outstanding anchoring, reporting, storytelling, and contributions to the news media and broader community.

11. The accolades and awards that ASHER has received include, but are not limited to:

    a. Eleven Emmy Awards for broadcasting excellence (including a 2025 Emmy nomination for Best News Special) and a previous winner of the highly coveted Emmy Award for Best News Anchor;

    b. Multiple awards and honors from the Michigan Association of Broadcasters and the Associated Press for excellence in journalism and broadcasting;

c. The Spirit of Detroit Award from the Detroit City Council in recognition of outstanding achievement and service to the citizens of Detroit; and

d. Numerous recognitions for her extensive charitable and community service work with organizations including The Salvation Army, Angels of Hope, Lighthouse of Oakland County, Coalition on Temporary Shelter ("COTS") Detroit, and On the Wings of Angels, which organizations support families affected by cancer, homelessness, poverty, and domestic abuse.

12. In 2022, ASHER became FOX's lead News Anchor for the evening news on "Fox 2 Detroit."

13. At all times, ASHER's job performance at FOX has been exemplary.

14. Notwithstanding ASHER's substantial contributions to FOX and the Metro Detroit community for many years, during ASHER's employment, FOX blatantly subjected ASHER to discriminatory conduct and disparate treatment based on her sex.

15. When ASHER reported and complained of FOX's discriminatory conduct, FOX subjected ASHER to numerous acts of illegal retaliation.

16. In or around July 2025, FOX hired Paul McGonagle as its new General Manager for the Fox 2 Detroit news station.

4

17.   Around the time of Mr. McGonagle's hiring, ASHER noticed an alarming pattern of female employees in leadership positions being terminated and replaced by men and, further, noticed that FOX treated ASHER's male counterpart and co-anchor, Roop Raj, more favorably than her by, among other things, providing Mr. Raj with more guest interview segment opportunities on the evening news than ASHER.

18.   ASHER further learned that Mr. Raj and other members of leadership were engaging in conversations concerning the assignment of guest interviews without ASHER present.

19.   These communications, which excluded ASHER, routinely resulted in Mr. Raj receiving more guest-segment interviews and opportunities to select from the available guest-segment pool.

20.   As a result of her observations, in or about early September 2025, ASHER met with Sean Lee (Assistant News Director).

21.   ASHER informed Ms. Lee of her observation that, due to the recent personnel decisions by FOX, the vast majority of leadership positions were held by men.

22.   ASHER further informed Ms. Lee that Mr. Raj had been treated more favorably by way of guest interview assignments and that Mr. Raj and other

5

employees were excluding ASHER from communications during which the assignment of guest interviews was determined.

23.    On or about September 25, 2025, ASHER attended a meeting with Mr. McGonagle.

24.    During the meeting, ASHER informed Mr. McGonagle that, recently, she had not been receiving the same opportunities as Mr. Raj.

25.    Further, ASHER stated that she was seeking to advocate for equal treatment between Mr. Raj and herself.

26.    During the meeting, Mr. McGonagle outlined the possibility of FOX relaunching a previous program called "Let it Rip" and assigning ASHER as host of the show, which would broadcast five days per week.

27.    ASHER expressed interest in this prospective opportunity.

28.    In or about October 2025, FOX hired Brooks Blanton as its new News Director.

29.    On or about October 6, 2025, ASHER attended a meeting to begin planning Fox 2 Detroit's election coverage for the November 2025 elections.

30.    During the meeting, ASHER identified four individuals to serve as potential guest interviewees for the election coverage, and Mr. Raj identified two potential guest interviewees.

31.    During the meeting it was determined that ASHER and Mr. Raj would divide outreach to the potential guest interviewees evenly.

32.    Nevertheless, on or about October 7, 2025, ASHER learned that Mr. Raj had unilaterally decided to reach out to five of the six potential interviewees himself.

33.    Thereafter, Mr. Raj and other FOX employees repeatedly excluded ASHER from relevant communications regarding guest interviews and scheduling related to the election coverage in November 2025.

34.    Throughout October 2025, FOX continued to assign Mr. Raj more guest-segment interviews.

35.    Later in October 2025, ASHER contacted Mr. McGonagle and Mr. Blanton and advised that she wished to schedule a meeting to discuss "Let it Rip."

36.    On or about October 28, 2025, ASHER attended a meeting with Mr. Blanton and Ms. Lee to discuss the "Let it Rip" show.

37.    During the meeting, Mr. Blanton advised that he would implement a schedule adjustment for ASHER to accommodate the additional responsibilities of the "Let it Rip" show.

38.    Specifically, Mr. Blanton advised that, upon ASHER beginning the "Let it Rip" show, ASHER would no longer serve as an on-air anchor for the Friday evening news.

39. Significantly, ASHER's contemplated schedule adjustment was identical to the schedule adjustment that FOX had already approved and implemented for Mr. Raj to accommodate an additional show he hosted, "The Pulse."

40. Indeed, Mr. Blanton stated that he was amenable to approving ASHER's requested schedule adjustment because he understood that the "Let it Rip" show carried the same workload as Mr. Raj's "The Pulse" show and because he claimed that he wanted to treat his anchors (i.e. ASHER and Mr. Raj) "equally."

41. On or about October 30, 2025, ASHER attended a meeting with Mr. Blanton in his office to further discuss "Let it Rip."

42. During the meeting, Mr. Blanton inexplicably rescinded his earlier approval of ASHER's schedule adjustment and stated that FOX would not give ASHER Fridays off from the evening news.

43. Moreover, Mr. Blanton expressed that ASHER would be required to continue anchoring the Friday evening news irrespective of the additional responsibilities of the "Let it Rip" show.

44. Mr. Blanton advised that the rescission of the schedule adjustment was done at the direction of Mr. McGonagle.

45. Mr. Blanton refused to provide any further explanation (other than Mr. McGonagle's directive) for the sudden refusal to treat ASHER and Mr. Raj

8

"equally" by providing them with similar schedule adjustments for hosting their respective shows.

46.     Significantly, FOX did not similarly rescind or refuse to provide Mr. Raj with his ongoing schedule adjustment for his hosting of "The Pulse."

47.     On or about October 30, 2025, Mr. Raj had, once again, been assigned the majority of the guest-segment interviews for the evening news.

48.     Nevertheless, ASHER herself previously booked and arranged a guest-segment interview for the 10:00 p.m. news.

49.     ASHER began preparing for the 10:00 p.m. guest interview that she had booked and arranged.

50.     During her preparation, ASHER reviewed the schedule/rundown for the news broadcast.

51.     Upon review, ASHER learned that Mr. Raj had been assigned the guest interview for the guest that ASHER had booked.

52.     Accordingly, ASHER spoke with Mr. Raj and questioned why he had been assigned to the 10:00 p.m. guest interview that ASHER had booked.

53.     Moreover, ASHER contacted Dylan Dulberg (Executive Producer) regarding the assignment of Mr. Raj to the guest interviewee.

54.    Ultimately, ASHER was forced to change the guest interview assignment herself to properly reflect that she would be responsible for the guest interview.

55.    After exiting the set upon the conclusion of the evening news, ASHER walked to her cubicle and spoke with Mr. Dulberg and Justin Orminski (Producer).

56.    During her conversation with Mr. Dulberg and Mr. Orminski, ASHER voiced her concern about Mr. Raj receiving the majority of the guest interview assignments and excluding her from the same.

57.    ASHER reminded Mr. Dulberg that the assignment of the 10:00 p.m. guest interview to Mr. Raj had only been remedied because ASHER herself recognized, reported, and corrected it.

58.    Furthermore, ASHER explained that she did not want to be treated worse than her male counterpart, similar to how past female news anchors at FOX had been treated.

59.    On or about October 31, 2025, ASHER sent an email to Mr. McGonagle stating:

Good morning Paul,

I'm excited about the Let It Rip reboot and want to ensure the show launches successfully. However, I need to be clear that I cannot move forward with launching the show, that will take a large amount of preparation time, until we first establish the schedule and expectations surrounding it.

10

As I mentioned to Brooks, **I'm concerned about the lack of balance and equity, particularly compared to my co-anchor who holds the same responsibilities but has a more accommodating schedule**.

Can we meet today or Monday to discuss? Please let me know what time works best.

(Emphasis added).

60.     In a subsequent email to Mr. McGonagle, ASHER restated her concern regarding FOX's decision to provide Mr. Raj with schedule flexibility but not provide the same for her and identified numerous similarities between her show and Mr. Raj's show.

61.     That same day, ASHER sent a text message to her co-anchor, Mr. Raj.

62.     Through her text message communication to Mr. Raj, ASHER emphasized and confirmed that she had not been frustrated or upset with Mr. Raj, however, ASHER expressed that she had been disappointed with FOX's unequal treatment of her based on her sex.

63.     In response, Mr. Raj stated, in part, "I know the feeling of being treated differently than other coworkers, as that has happened to me in the past, not because of gender, but because of other issues. And I know it's important to feel like you have an even [and] equal shot. And I know that that's what you're going to get because you won't have it any other way and I don't blame you."

64.     On or about November 3, 2025, ASHER attended a meeting with Mr. McGonagle to discuss the "Let it Rip" show and ASHER's October 31, 2025 emails.

11

65.     During the meeting, ASHER complained about FOX's failure and refusal to provide the same schedule accommodations that it extended to her male counterpart, Mr. Raj.

66.     Moreover, ASHER complained that FOX had been treating ASHER worse than her male counterpart because of her sex and despite the fact that she and Mr. Raj had the same workload and responsibilities.

67.     Further, ASHER explained that it was impractical for her to host "Let it Rip" while maintaining her existing responsibilities and without an adjustment to her schedule, similar to that which FOX had provided to Mr. Raj for "The Pulse."

68.     Nevertheless, Mr. McGonagle continued to refuse to offer ASHER the same or similar schedule adjustments as Mr. Raj.

69.     Instead, Mr. McGonagle stated that FOX would put the "Let it Rip" show "on hold."

70.     On or about November 4, 2025, ASHER reported to work and prepared for her responsibilities for the evening news, which included extensive election coverage.

71.     Upon her arrival, ASHER learned that Mr. Raj had been assigned all of the guest-segment interviews for both the 5:00 p.m. and 6:00 p.m. election coverage.

72. Significantly, ASHER had previously agreed with Mr. Raj and the rest of the evening news department that the guest-segment interviews would be divided equally between her and Mr. Raj.

73. As a result, ASHER spoke with Traci Ditchie (Executive Producer), consistent with newsroom protocols and reporting structure.

74. While speaking with Ms. Ditchie, ASHER asked Ms. Ditchie why nearly all guest-segment interviews had been assigned to Mr. Raj and requested assistance in addressing the same.

75. Ms. Ditchie responded by claiming she was "busy," dismissed ASHER and ASHER's concerns, and directed ASHER to speak with a producer in the newsroom.

76. Accordingly, ASHER spoke with Scott Brewer (Producer).

77. ASHER outlined the imbalance in assignments between her and Mr. Raj for the upcoming broadcasts and requested assistance in addressing the same.

78. Further, ASHER reminded Mr. Brewer that the guest interview assignments were supposed to be evenly divided between ASHER and Mr. Raj.

79. Mr. Brewer advised that he would work on correcting the guest interview assignments.

80. After speaking with Mr. Brewer, ASHER met with Mr. Raj.

81.     ASHER informed Mr. Raj of her concern with Mr. Raj receiving preferable treatment, with his repeated practice of claiming interview segments that otherwise would have been assigned to ASHER, and with his claiming such segments by intentionally excluding ASHER from communications.

82.     ASHER reminded Mr. Raj that guest interview coordination should have been a shared responsibility.

83.     Mr. Raj refused to acknowledge his repeated circumvention of ASHER's role and responsibilities.

84.     Soon thereafter, ASHER spoke with Ms. Lee.

85.     ASHER explained to Ms. Lee the disparate treatment she had been experiencing (i.e., Mr. Raj being assigned the vast majority of guest interviews and Mr. Raj and multiple others excluding her from decision-making processes).

86.     Despite ASHER's explanation of the ongoing disparate treatment she experienced, Ms. Lee dismissed ASHER's concerns and erroneously claimed that ASHER and Mr. Raj had been treated equally.

87.     Later that evening, while on set, ASHER received an email from Dalina Hayes (Director of Human Resources) requesting that ASHER contact her on November 5, 2025.

88.     After receiving the communication from Ms. Hayes, ASHER once again met with Ms. Lee.

89.     While meeting with Ms. Lee, ASHER restated her concern with the unequal treatment as between Mr. Raj and her.

90.     Further, ASHER questioned why she (ASHER) had been contacted by FOX's human resources department.

91.     Ms. Lee refused to provide a reason regarding why Ms. Hayes contacted ASHER.

92.     On or about November 5, ASHER was directed to attend a meeting with Ms. Hayes and Mr. Blanton.

93.     During the meeting, Ms. Hayes and Mr. Blanton advised that FOX was placing ASHER on leave pending an investigation into alleged complaints of "egregious behavior" based on ASHER's communications with Mr. Dulberg and ASHER's interactions with FOX employees on November 4.

94.     Further, Ms. Hayes and Mr. Blanton claimed that ASHER appeared "upset" on-air after a production error occurred during the November 4, 2025 broadcast of election coverage.

95.     ASHER's job performance during the November 4, 2025 Election Day broadcast was exemplary.

96.     Upon information and belief, FOX had not, at any time prior, placed any on-air employee on leave pending an "investigation" into the employee.

97.     FOX nevertheless placed ASHER on leave.

98. Upon information and belief, on or about November 5, Mr. Raj contacted FOX's human resources department, offensively labeled ASHER as "jealous," and grossly mischaracterized ASHER's complaints of sex-based discrimination as ASHER "[having] an issue with men vs. women."

99. On or about November 14, 2025, ASHER attended a meeting with Mr. Blanton and Ms. Hayes.

100. During the meeting, ASHER was accompanied by representatives from the Screen Actors Guild and the American Federation of Television and Radio Artists Union (the "Union").

101. During the meeting, Ms. Hayes and Mr. Blanton continued to erroneously assert that ASHER had engaged in unprofessional conduct and claimed that ASHER's alleged use of profanity constituted unprofessional conduct.

102. Throughout the meeting, ASHER and her Union representatives repeatedly emphasized that ASHER had not engaged in unprofessional conduct warranting disciplinary action and had, instead, been objecting to and complaining about FOX's discriminatory treatment of ASHER based on her sex.

103. On or about November 21, 2025, Mr. Blanton and Ms. Hayes contacted ASHER by phone.

104.   During the call, Mr. Blanton stated that, after the two-week investigation, FOX had determined that "[November 21, 2025] would be [ASHER's] last day at Fox 2," thereby terminating ASHER's employment.

105.   Upon information and belief, Jack Abernethy (Chief Executive Officer of Fox TV) authorized and approved ASHER's termination.

106.   Mr. Blanton and Ms. Hayes advised that FOX decided to terminate ASHER's employment based on accusations that ASHER had engaged in alleged "outbursts."

107.   Significantly, at no time did ASHER engage in "outbursts" or engage in unprofessional conduct warranting disciplinary action or termination.

108.   During the call, Mr. Blanton advised that FOX would send ASHER a termination letter.

109.   FOX did not provide ASHER with a termination letter at that time.

110.   On or about November 25, 2025, ASHER's Union attorney contacted FOX on ASHER's behalf seeking reinstatement of ASHER's employment and noting that FOX had continued to broadcast promotional materials and advertisements featuring ASHER.

111.   FOX declined to reinstate ASHER.

112.   On or about November 28, 2025, ASHER communicated with FOX, through counsel, regarding her termination of employment.

113. Thereafter, FOX erroneously claimed that it had not terminated ASHER; however, FOX refused to allow ASHER to return to work while at the same time continuing to broadcast promotional materials and advertisements featuring ASHER.

114. FOX has since informed ASHER that her employment with FOX will end in June 2026 and that FOX will not renew ASHER's employment agreement with FOX.

115. FOX, on numerous occasions, has permitted, tolerated, and/or ignored unprofessional behavior and misconduct by multiple male employees without suspending or terminating those male employees, including but not limited to:

    a. Mr. Raj: In or about December 2012, Mr. Raj was arrested for Driving Under the Influence. FOX merely suspended Mr. Raj for two weeks and granted him numerous promotions thereafter.

    b. Mr. McGonagle: In or about November 2018, Mr. McGonagle was arrested for Driving While Intoxicated while working for FOX's WTTG station. FOX later promoted Mr. McGonagle.

    c. Charlie LeDuff: Mr. LeDuff worked as an on-air journalist for the Fox 2 Detroit news until 2016. In or about 2013, Mr. LeDuff was arrested for disorderly conduct in connection with an incident wherein he bit the ear of a security guard. FOX did not terminate Mr. LeDuff's employment.

    d. A male employee working as FOX's Vice President of Streaming Content repeatedly exhibited severe anger issues and violent tendencies, including constantly shouting "Fuck" and other profanities at employees and violently kicking a trash can in the office. Upon information and belief, this individual was not terminated for this behavior.

e. During a meeting between FOX's human resources department and representatives from the Union, the attendees discussed a male employee who shouted "Fuck" at a coworker. The male employee was not terminated and was later promoted.

f. In or about 2024, a longtime male anchor was the subject of multiple complaints concerning sexually inappropriate comments made in the newsroom and the studio. FOX did not terminate this male anchor and, instead, issued him a warning.

g. In or about 2025, two male producers were reported for egregious sexual harassment of a female morning news anchor. FOX did not terminate either male producer. Instead, FOX offered each the option to transfer to different roles.

116. On or about March 16, 2026, ASHER filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

117. On or about May 11, 2026, the EEOC issued ASHER a Notice of Right to Sue.

118. On or about May 28, 2026, FOX sent ASHER a termination letter advising that her employment would end June 5, 2026.

## COUNT I: SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

## AND

## COUNT II: SEX DISCRIMINATION IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT

119. ASHER incorporates Paragraphs 1 through 118.

120. Title VII prohibits employers from discriminating against any individual regarding the compensation, terms, conditions, or privileges of employment because of the employee's sex. 42 U.S.C. § 2000e-2(a)(1).

19

121. The ELCRA prohibits employers from discriminating against any individual regarding the compensation, terms, conditions, or privileges of employment, because of the employee's sex. MCL § 37.2202(1)(a).

122. Defendant Fox TV and Defendant NWCD are employers within the meaning of Title VII and the ELCRA. *See* 42 U.S.C. § 2000e(b); MCL § 37.2201(a).

123. At all relevant times, Defendants had a duty under Title VII and the ELCRA not to discharge or otherwise discriminate against ASHER because of her sex (female).

124. Defendants violated ASHER's civil rights by discriminating against ASHER because of her sex, which discrimination includes, but is not limited to:

    a. Refusing to provide ASHER with the same schedule accommodations that Defendants provided to ASHER's similarly-situated male counterpart, Mr. Raj, for ASHER's performance of similar responsibilities.

    b. Assigning ASHER less guest interviews than her similarly situated male counterpart.

    c. Excluding ASHER from communications related to guest-segment interviews and the November 2025 election coverage broadcasts.

    d. Failing and refusing to ensure ASHER received equal (i.e., not disparate) treatment to that of her similarly-situated male counterpart, Mr. Raj.

    e. Summarily dismissing and refusing to meaningfully investigate ASHER's complaints of disparate treatment and discrimination based on sex.

f.    Permitting ASHER's similarly-situated male counterpart, Mr. Raj, to circumvent and undermine ASHER and ASHER's employment responsibilities.

g.    Terminating ASHER's employment based on clearly erroneous allegations of conduct that, even taken as true, are substantially less severe than conduct which similarly-situated male employees engaged in without similar adverse action.

h.    Otherwise treating similar-situated male employees more favorably than ASHER.

125.    If ASHER had not been female, she would not have been treated in the same discriminatory manner.

126.    As a direct and proximate result of Defendants' violations of Plaintiff's civil rights, ASHER has suffered damages, including but not limited to, loss of past and future income and employee benefits, mental anguish and emotional distress, loss of professional reputation and esteem, attorney fees, costs, and interest.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter Judgment against Defendants, in whatever amount is shown to be established by the proofs in this cause, including lost past and future wages, lost benefits, mental and emotional distress damages, loss of professional reputation and esteem, and punitive damages, together with interest, costs, and attorneys' fees.

## COUNT III: RETALIATION FOR OPPOSING SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

## AND

21

## COUNT IV: RETALIATION FOR OPPOSING SEX DISCRIMINATION IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT

127.    ASHER incorporates Paragraphs 1 through 118.

128.    Title VII prohibits an employer from retaliating or discriminating against an employee because the employee has opposed an unlawful employment practice under Title VII. 42 U.S.C. § 2000e-3(a).

129.    The ELCRA prohibits a person from retaliating or discriminating against an individual because the individual has opposed a violation of the ELCRA. MCL § 37.2701(a).

130.    Defendants are employers within the meaning of Title VII. 42 U.S.C. § 2000e(b).

131.    Defendants together and/or individually constitute a "person" within the meaning of the ELCRA. MCL § 37.2103(h).

132.    It is a violation of Title VII and the ELCRA for an employer to discriminate against an individual because of the individual's sex. 42 U.S.C. § 2000e-2(a)(1); MCL § 37.2202(1)(a).

133.    Defendants violated Title VII and the ELCRA when they discriminated against ASHER because of her sex.

134.    ASHER opposed Defendants' violations of Title VII and ELCRA by repeatedly informing and complaining to Defendants and Defendants' employees

22

about numerous incidents wherein ASHER was discriminated against because of her sex and treated less favorably because of her sex.

135. At all relevant times, Defendants had a duty under Title VII and the ELCRA not to retaliate or discriminate against ASHER because of her opposition to Defendants' violations of Title VII and the ELCRA.

136. Defendants violated ASHER's civil rights by retaliating against ASHER for engaging in legally protected activity, namely, her opposition to Defendants' violations of Title VII and the ELCRA, in ways that include but are not limited to:

      a.    Suspending ASHER from her position as News Anchor.

      b.    Subjecting ASHER to an investigation predicated upon erroneous allegations.

      c.    Refusing to reinstate ASHER into her position as News Anchor.

      d.    Terminating ASHER's employment.

137. As a direct and proximate result of Defendants' violations of ASHER's civil rights, ASHER has suffered damages, including but not limited to, loss of past and future income and employee benefits, mental anguish and emotional distress, and loss of professional reputation and esteem, attorney fees, costs, and interest.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter Judgment against Defendants, in whatever amount is shown to be established by the proofs in this cause, including lost past and future wages, lost benefits, mental and emotional

23

distress damages, loss of professional reputation and esteem, and punitive damages,

together with interest, costs, and attorneys' fees.

SOMMERS SCHWARTZ, P.C.

*/s/Tad T. Roumayah*
Matthew L. Turner (P48706)
Tad T. Roumayah (P74081)
Nathan A. Robbins (P87794)
Attorneys for Plaintiff
One Towne Square, Suite 1700
Southfield, Michigan 48076
(248) 355-0300

Dated:        June 3, 2026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

**TARYN ASHER,**

      Plaintiff,

v.                                   Case No.
                                       Hon.

**FOX TELEVISION STATIONS, LLC,**
and **NEW WORLD COMMUNICATIONS**
**OF DETROIT d/b/a WJBK-TV,** jointly and
severally

      Defendants.

_____/

SOMMERS SCHWARTZ, P.C.
Matthew L. Turner (P48706)
Tad T. Roumayah (P74081)
Nathan A. Robbins (P87794)
Attorneys for Plaintiff
One Towne Square, Suite 1700
Southfield, Michigan 48076
(248) 355-0300
mturner@sommerspc.com
troumayah@sommerspc.com
nrobbins@sommerspc.com

_____/

## DEMAND FOR TRIAL BY JURY

      NOW COMES Plaintiff, Taryn Asher, by and through her attorneys, Sommers

Schwartz, P.C., and hereby demands a trial by jury relative to the above matter.

                              SOMMERS SCHWARTZ, P.C.

                              */s/Tad T. Roumayah*
                              Matthew L. Turner (P48706)

1

2

Tad T. Roumayah (P74081)
Nathan A. Robbins (P87794)
Attorney for Plaintiff
One Towne Square, Suite 1700
Southfield, Michigan 48076
(248) 355-0300

Dated:        June 3, 2026

2