**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| **TARYN ASHER**,<br><br>Plaintiff/Counter-Defendant,<br><br>v.<br><br>**FOX TELEVISION STATIONS, LLC** and **NEW WORLD COMMUNICATIONS OF DETROIT d/b/a WJBK-TV**,<br><br>Defendants/Counter-Plaintiffs. | Case No.: 2:26-cv-11820<br><br>District Judge Linda V. Parker<br><br>Magistrate Judge Kimberly G. Altman |

**DEFENDANTS' ANSWER AND**
**AFFIRMATIVE DEFENSES TO FIRST AMENDED COMPLAINT**
**AND COUNTERCLAIMS**

Defendants/Counter-Plaintiffs Fox Television Stations, LLC ("Fox") and New World Communications of Detroit, Inc., owner and operator of television station WJBK-TV ("NWCD") (collectively referred to as "Defendants"), by and through their undersigned counsel, hereby submit the following Answer and Affirmative Defenses to the First Amended Complaint ("FAC") filed by Plaintiff Taryn Asher ("Plaintiff" or "Asher").

**PARTIES**

1. Plaintiff, ASHER, is an individual who resides in the City of Birmingham, Oakland County, State of Michigan.

**ANSWER:** Defendants admit the allegations in Paragraph 1 of the FAC.

2. Defendant, Fox Television Stations, LLC ("Fox TV"), is incorporated in the State of Delaware and maintains its principal place of business in the City of Los Angeles, Los Angeles County, State of California.

**ANSWER:** Defendants admit the allegations in Paragraph 2 of the FAC.

3. Defendant, New World Communications of Detroit d/b/a WJBK-TV ("NWCD"), is incorporated in the State of Delaware and maintains its principal place of business in the City of Southfield, Oakland County, State of Michigan.

**ANSWER:** Defendants admit that NWCD is the owner and operator of television station WJBK-TV in Detroit, Michigan. Defendants further admit that NWCD is incorporated in the State of Delaware and maintains its principal place of business in Southfield, Oakland County, Michigan. Defendants deny any remaining allegations in Paragraph 3 of the FAC.

## JURISDICTION

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

**ANSWER:** The allegations in Paragraph 4 of the FAC are legal conclusions to which no response is required. To the extent a response is required, Defendants admit that this Court has jurisdiction over Asher's claims brought under federal law pursuant to 28 U.S.C. § 1331. Defendants deny any remaining allegations in Paragraph 4 of the FAC.

5. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they originate from the same facts that form the basis of her federal claims.

**ANSWER:** The allegations in Paragraph 5 of the FAC are legal conclusions to which no response is required. To the extent a response is required, Defendants admit that this Court has jurisdiction over Asher's claims brought under state law pursuant to 28 U.S.C. § 1367. Defendants deny any remaining allegations in Paragraph 5 of the FAC.

6. This Court has personal jurisdiction over Defendants because Defendants conduct business within the state of Michigan and employed Plaintiff and other individuals within the state of Michigan.

**ANSWER:** The allegations in Paragraph 6 of the FAC are legal conclusions to which no response is required. To the extent a response is required, Defendants admit that this Court has personal jurisdiction over them, that they conduct business within the State of Michigan, and that NWCD employed Asher and/or other individuals within the State of Michigan. Defendants deny any remaining allegations in Paragraph 6 of the FAC.

7. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391 because Defendants employed Plaintiff in this District, Defendants conduct business in this District, and the actions and omissions giving rise to the claims pled in this Complaint substantially occurred in this District.

**ANSWER:** The allegations in Paragraph 7 of the FAC are legal conclusions to which no response is required. To the extent a response is required, Defendants admit that venue in this Court is proper, that they conduct business within this Court's district, that NWCD employed Asher within this Court's district, and that the alleged events concerning Asher's claims are alleged to have occurred within

this Court's district. Defendants deny the remaining allegations in Paragraph 7 of the FAC.

## GENERAL ALLEGATIONS

8. ASHER holds a Journalism degree from Michigan State University.

**ANSWER:** Defendants admit the allegations in Paragraph 8 of the FAC.

9. ASHER has devoted the majority of her professional journalistic career to FOX and dutifully served as News Anchor on FOX's "Fox 2 Detroit" news program since 2007.

**ANSWER:** Defendants admit that Asher has served as a reporter or anchor on "FOX 2 Detroit" news since 2007. Defendants deny that Asher was solely a "News Anchor" at Fox 2 Detroit since 2007. Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 9 of the FAC.

10. ASHER has been a trusted and beloved fixture of the Metro Detroit community for many years and has received numerous accolades and awards for her outstanding anchoring, reporting, storytelling, and contributions to the news media and broader community.

**ANSWER:** Defendants admit Asher has received certain honors and awards related to the media industry at times during her career. Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 10 of the FAC.

11. The accolades and awards that ASHER has received include, but are not limited to:

a. Eleven Emmy Awards for broadcasting excellence (including a 2025 Emmy nomination for Best News Special) and a previous winner of the highly coveted Emmy Award for Best News Anchor;

b. Multiple awards and honors from the Michigan Association of Broadcasters and the Associated Press for excellence in journalism and broadcasting;

c. The Spirit of Detroit Award from the Detroit City Council in recognition of outstanding achievement and service to the citizens of Detroit; and

d. Numerous recognitions for her extensive charitable and community service work with organizations including The Salvation Army, Angels of Hope, Lighthouse of Oakland County, Coalition on Temporary Shelter ("COTS") Detroit, and On the Wings of Angels, which organizations support families affected by cancer, homelessness, poverty, and domestic abuse.

**ANSWER:** Defendants admit that Asher, either individually or as part of a WJBK-TV team, has received certain honors and awards related to the media industry at times during her career. Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 11 of the FAC.

12. In 2022, ASHER became FOX's lead News Anchor for the evening news on "Fox 2 Detroit."

**ANSWER:** Defendants admit that in or around 2022, Asher and Roop Raj became the primary anchors for the evening news on "Fox 2 Detroit." Defendants deny the remaining allegations in Paragraph 12 of the FAC.

13. At all times, ASHER's job performance at FOX has been exemplary.

**ANSWER:** Defendants deny the allegations in Paragraph 13 of the FAC.

14. Notwithstanding ASHER's substantial contributions to FOX and the Metro Detroit community for many years, during ASHER's employment, FOX blatantly subjected ASHER to discriminatory conduct and disparate treatment based on her sex.

**ANSWER:** Defendants deny the allegations in Paragraph 14 of the FAC.

15. When ASHER reported and complained of FOX's discriminatory conduct, FOX subjected ASHER to numerous acts of illegal retaliation.

**ANSWER:** Defendants deny the allegations in Paragraph 15 of the FAC.

16. In or around July 2025, FOX hired Paul McGonagle as its new General Manager for the Fox 2 Detroit news station.

**ANSWER:** Defendants admit the allegations in Paragraph 16 of the FAC.

17. Around the time of Mr. McGonagle's hiring, ASHER noticed an alarming pattern of female employees in leadership positions being terminated and replaced by men and, further, noticed that FOX treated ASHER's male counterpart and co-anchor, Roop Raj, more favorably than her by, among other things, providing Mr. Raj with more guest interview segment opportunities on the evening news than ASHER.

**ANSWER:** Defendants deny the allegations in Paragraph 17 of the FAC.

18. ASHER further learned that Mr. Raj and other members of leadership were engaging in conversations concerning the assignment of guest interviews without ASHER present.

**ANSWER:** Defendants admit that Raj discussed guest assignments with leadership and others during editorial meetings that Asher frequently failed to attend, despite being encouraged (and on certain occasions, requested) to attend. Defendants lack information sufficient to form a belief as to the truth of the allegations as to what Asher allegedly "learned." Defendants deny the remaining allegations in Paragraph 18 of the FAC.

19. These communications, which excluded ASHER, routinely resulted in Mr. Raj receiving more guest-segment interviews and opportunities to select from the available guest-segment pool.

**ANSWER:** Defendants deny the allegations in Paragraph 19 of the FAC.

20. As a result of her observations, in or about early September 2025, ASHER met with Sean Lee (Assistant News Director).

**ANSWER:** Defendants admit that Asher met with Sean Lee in or about early September 2025, and that Lee held the title of Assistant News Director at that time. Defendants lack information sufficient to form a belief as to the truth of the allegation as to Asher's alleged "observations" or what she may have done "as a result" of such alleged "observations." Defendants deny the remaining allegations in Paragraph 20 of the FAC.

21. ASHER informed Ms. Lee of her observation that, due to the recent personnel decisions by FOX, the vast majority of leadership positions were held by men.

**ANSWER:** Defendants deny the allegations in Paragraph 21 of the FAC (including, without limitation, the alleged truth of Asher's alleged statements to Lee).

22. ASHER further informed Ms. Lee that Mr. Raj had been treated more favorably by way of guest interview assignments and that Mr. Raj and other employees were excluding ASHER from communications during which the assignment of guest interviews was determined.

**ANSWER:** Defendants admit that in or about early September 2025, Asher expressed to Lee that she felt like she was being left out of conversations in which guest interviews were discussed in editorial meetings that Asher was not attending.

Defendants deny the remaining allegations in Paragraph 22 of the FAC (including, without limitation, the alleged truth of Asher's alleged statements to Lee and that Asher was "exclude[ed]" from communications).

23. On or about September 25, 2025, ASHER attended a meeting with Mr. McGonagle.

**ANSWER:** Defendants admit the allegations in Paragraph 23 of the FAC.

24. During the meeting, ASHER informed Mr. McGonagle that, recently, she had not been receiving the same opportunities as Mr. Raj.

**ANSWER:** Defendants admit that during their September 25, 2025 meeting, Asher and McGonagle discussed (among other things) Asher's belief that Raj was receiving more guest interview opportunities than her. Defendants deny the remaining allegations in Paragraph 24 of the FAC (including, without limitation, the alleged truth of Asher's alleged statements to McGonagle).

25. Further, ASHER stated that she was seeking to advocate for equal treatment between Mr. Raj and herself.

**ANSWER:** Defendants deny the allegations in Paragraph 25 of the FAC.

26. During the meeting, Mr. McGonagle outlined the possibility of FOX relaunching a previous program called "Let it Rip" and assigning ASHER as a host of the show, which would broadcast five days per week.

**ANSWER:** Defendants admit the allegations in Paragraph 26 of the FAC.

27. ASHER expressed interest in this prospective opportunity.

**ANSWER:** Defendants admit that during their September 25, 2025 meeting, Asher expressed interest in potentially hosting "Let It Rip." Defendants deny any remaining allegations in Paragraph 27 of the FAC.

28. In or about October 2025, FOX hired Brooks Blanton as its new News Director.

**ANSWER:** Defendants admit the allegations in Paragraph 28 of the FAC.

29. On or about October 6, 2025, ASHER attended a meeting to begin planning Fox 2 Detroit's election coverage for the November 2025 elections.

**ANSWER:** Defendants admit the allegations in Paragraph 29 of the FAC.

30. During the meeting, ASHER identified four individuals to serve as potential guest interviewees for the election coverage, and Mr. Raj identified two potential guest interviewees.

**ANSWER:** Defendants admit that during the October 6, 2025 meeting, Asher and Raj identified individuals to serve as potential guest interviewees for election coverage. Defendants deny the remaining allegations in Paragraph 30 of the FAC.

31. During the meeting it was determined that ASHER and Mr. Raj would divide outreach to the potential guest interviewees evenly.

**ANSWER:** Defendants deny the allegations in Paragraph 31 of the FAC.

32. Nevertheless, on or about October 7, 2025, ASHER learned that Mr. Raj had unilaterally decided to reach out to five of the six potential interviewees himself.

**ANSWER:** Defendants admit that Raj contacted certain potential interviewees regarding their availability for the separate, daily news politics show called "The Pulse" that Raj hosted on his own, and at the same time, Raj also asked

those potential interviewees about their availability for the election coverage shows Raj and Asher would be hosting together. Defendants lack information sufficient to form a belief as to the truth of the allegations regarding what Asher allegedly learned on October 7, 2025. Defendants deny the remaining allegations in Paragraph 32 of the FAC (including, without limitation, what Asher allegedly learned).

33. Thereafter, Mr. Raj and other FOX employees repeatedly excluded ASHER from relevant communications regarding guest interviews and scheduling related to the election coverage in November 2025.

**ANSWER:** Defendants deny the allegations in Paragraph 33 of the FAC.

34. Throughout October 2025, FOX continued to assign Mr. Raj a greater volume of guest-segment interviews.

**ANSWER:** Defendants deny the allegations in Paragraph 34 of the FAC.

35. Later in October 2025, ASHER contacted Mr. McGonagle and Mr. Blanton and advised that she wished to schedule a meeting to discuss "Let it Rip."

**ANSWER:** Defendants admit that in late October 2025, Asher sought a meeting to discuss the "Let It Rip" show. Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 35 of the FAC.

36. On or about October 28, 2025, ASHER attended a meeting with Mr. Blanton and Ms. Lee to discuss the "Let it Rip" show.

**ANSWER:** Defendants admit the allegations in Paragraph 36 of the FAC.

37. During the meeting, Mr. Blanton advised that he would implement a schedule adjustment for ASHER to accommodate the additional responsibilities of the "Let it Rip" show.

**ANSWER:** Defendants deny the allegations in Paragraph 37 of the FAC.

38. Specifically, Mr. Blanton advised that, upon ASHER beginning the "Let it Rip" show, ASHER would no longer serve as an on-air anchor for the Friday evening news.

**ANSWER:** Defendants deny the allegations in Paragraph 38 of the FAC.

39. Significantly, ASHER's contemplated schedule adjustment was identical to the schedule adjustment that FOX had already approved and implemented for Mr. Raj to accommodate an additional show he hosted, "The Pulse."

**ANSWER:** Defendants admit that since approximately July 2024, Raj has hosted an additional daily news politics show called "The Pulse" that was regularly scheduled and aired Monday through Friday in multiple news markets, and that Raj's schedule was adjusted by a prior general manager, so Raj was not a regular on-air anchor for the Friday evening 10:00 p.m. and 11:00 p.m. newscasts. Defendants further admit that Asher expressed reservations about the additional workload and suggested a schedule adjustment in connection with discussing the possible relaunch of "Let It Rip" that would have allowed her to have Fridays off from anchoring the Friday evening 10:00 p.m. and 11:00 p.m. newscasts and from livestreaming "Let It Rip" on Fridays. Defendants deny the remaining allegations in Paragraph 39 of the FAC (including, without limitation, that Asher's suggested schedule adjustment was allegedly "identical" to Raj's schedule adjustment).

40. Indeed, Mr. Blanton stated that he was amenable to approving ASHER's requested schedule adjustment because he understood that the "Let it Rip" show carried the same workload as Mr. Raj's "The Pulse" show and because he claimed that he wanted to treat his anchors (i.e., ASHER and Mr. Raj) "equally."

**ANSWER:** Defendants admit that Blanton generally believes that employees should be treated fairly, and in his meeting with Asher on or about October 28, 2025, said words to the effect of he wanted to treat employees fairly and equally. Defendants deny the remaining allegations in Paragraph 40 of the FAC.

41. On or about October 30, 2025, ASHER attended a meeting with Mr. Blanton in his office to further discuss "Let it Rip."

**ANSWER:** Defendants admit the allegations in Paragraph 40 of the FAC.

42. During the meeting, Mr. Blanton inexplicably rescinded his earlier approval of ASHER's schedule adjustment and stated that FOX would not give ASHER Fridays off from the evening news.

**ANSWER:** Defendants admit that Blanton explained to Asher in their meeting on or about October 30, 2025, that she would continue to anchor the Friday evening 10:00 p.m. and 11:00 p.m. newscasts. Defendants deny the remaining allegations in Paragraph 42 of the FAC.

43. Moreover, Mr. Blanton expressed that ASHER would be required to continue anchoring the Friday evening news irrespective of the additional responsibilities of the "Let it Rip" show.

**ANSWER:** Defendants admit that Blanton told Asher that she would be required to continue anchoring the Friday evening 10:00 p.m. and 11:00 p.m. newscasts. Defendants deny the remaining allegations in Paragraph 43 of the FAC.

44. Mr. Blanton advised that the rescission of the schedule adjustment was done at the direction of Mr. McGonagle.

**ANSWER:** Defendants admit Blanton told Asher that McGonagle did not approve of her contemplated schedule adjustment. Defendants deny the remaining allegations in Paragraph 44 of the FAC.

45. Mr. Blanton refused to provide any further explanation (other than Mr. McGonagle's directive) for the sudden refusal to treat ASHER and Mr. Raj "equally" by providing them with similar schedule adjustments for hosting their respective shows.

**ANSWER:** Defendants deny the allegations in Paragraph 45 of the FAC.

46. Significantly, FOX did not similarly rescind or refuse to provide Mr. Raj with his ongoing schedule adjustment for his hosting of "The Pulse."

**ANSWER:** Defendants admit that no changes were made in October 2025 to Raj's then-current schedule. Defendants deny the remaining allegations in Paragraph 46 of the FAC.

47. On or about October 30, 2025, Mr. Raj had, once again, been assigned the majority of the guest-segment interviews for the evening news.

**ANSWER:** Defendants deny the allegations in Paragraph 47 of the FAC.

48. Nevertheless, ASHER herself previously booked and arranged a guest-segment interview for the 10:00 p.m. news.

**ANSWER:** Defendants admit that Asher had booked and arranged a guest interview for the 10:00 p.m. newscast on October 30, 2025. Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 48 of the FAC.

49. ASHER began preparing for the 10:00 p.m. guest interview that she had booked and arranged.

**ANSWER:** Defendants admit that Asher had booked and arranged a guest interview for the 10:00 p.m. newscast on October 30, 2025. Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 49 of the FAC.

50. During her preparation, ASHER reviewed the schedule/rundown for the news broadcast.

**ANSWER:** Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 50 of the FAC.

51. Upon review, ASHER learned that, inexplicably, Mr. Raj had been assigned the guest interview for the guest that ASHER had booked.

**ANSWER:** Defendants lack information sufficient to form a belief as to the truth of the allegations regarding what Asher allegedly "learned." Defendants deny the remaining allegations in Paragraph 51 (including, without limitation, that Raj had been assigned the guest interview for the guest Asher had booked for the 10:00 p.m. newscast on October 30, 2025).

52. Accordingly, ASHER spoke with Mr. Raj and questioned why he had been assigned to the 10:00 p.m. guest interview that ASHER had booked.

**ANSWER:** Defendants admit that Asher questioned Raj about her mistaken belief that Raj had been assigned to the guest interview she had booked for the 10:00 p.m. newscast on October 30, 2025. Defendants deny any remaining allegations in Paragraph 52 of the FAC (including, without limitation, that Raj was "assigned to the 10:00 p.m. guest interview that Asher had booked" on October 30, 2025).

53. Moreover, ASHER contacted Dylan Dulberg (Executive Producer) regarding the assignment of Mr. Raj to the guest interviewee.

**ANSWER:** Defendants admit that during the 6:00 p.m. newscast on October 30, 2025, Asher messaged Producer Justin Orminski regarding the guest interview she had booked (and which, in fact, she – not Raj, had been assigned) for the 10:00 p.m. newscast on October 30, 2025. Defendants further admit that Dylan Dulberg was an Executive Producer as of October 30, 2025. Defendants deny the remaining allegations in Paragraph 53 of the FAC (including, without limitation, that Raj was assigned to that guest interview on October 30, 2025).

54. Ultimately, ASHER was forced to change the guest interview assignment herself to properly reflect that she would be responsible for the guest interview.

**ANSWER:** Defendants deny the allegations in Paragraph 54 of the FAC.

55. After exiting the set upon the conclusion of the evening news, ASHER walked to her cubicle and spoke with Mr. Dulberg and Justin Orminski (Producer).

**ANSWER:** Defendants admit that after the 6:00 p.m. newscast on October 30, 2025, Asher spoke in a raised voice to (and, at times, was shouting at) Dulberg and Orminski at her cubicle. Defendants deny the remaining allegations in Paragraph 55 of the FAC.

56. During her conversation with Mr. Dulberg and Mr. Orminski, ASHER voiced her concern about Mr. Raj receiving the majority of the guest interview assignments and excluding her from the same.

**ANSWER:** Defendants admit that Asher spoke in a raised voice (and, at times, was shouting at) Dulberg and Orminski about her mistaken belief that Raj had

been assigned to the guest interview she had booked for the 10:00 p.m. newscast on October 30, 2025. Defendants deny the remaining allegations in Paragraph 56 of the FAC (including, without limitation, the alleged truth of Asher's alleged statements to Dulberg and Orminski).

57. ASHER reminded Mr. Dulberg that the assignment of the 10:00 p.m. guest interview to Mr. Raj had only been remedied because ASHER herself recognized, reported, and corrected it.

**ANSWER:** Defendants admit Asher (erroneously) claimed to Dulberg that the assignment of the 10:00 p.m. guest interview had only been remedied because she had changed it. Defendants deny the remaining allegations in Paragraph 57 of the FAC (including, without limitation, the truth of Asher's alleged statements to Dulberg).

58. Furthermore, ASHER explained that she did not want to be treated worse than her male counterpart, similar to how past female news anchors at FOX had been treated.

**ANSWER:** Defendants admit that on October 30, 2025, Asher used words to the effect of she did not want to be treated the way she believed a past female news anchor at the station had been treated. Defendants deny the remaining allegations in Paragraph 57 of the FAC (including, without limitation, that Defendants have improperly treated any female news anchors).

59. On or about October 31, 2025, ASHER sent an email to Mr. McGonagle stating:

Good morning Paul,

> I'm excited about the Let It Rip reboot and want to ensure the show launches successfully. However, I need to be clear that I cannot move forward with launching the show, that will take a large amount of preparation time, until we first establish the schedule and expectations surrounding it.
>
> As I mentioned to Brooks, **I'm concerned about the lack of balance and equity, particularly compared to my co-anchor who holds the same responsibilities but has a more accommodating schedule**.
>
> Can we meet today or Monday to discuss? Please let me know what time works best.

(Emphasis added).

**ANSWER:** Defendants admit that Paragraph 59 of the FAC purports to quote Asher's October 31, 2025 email to McGonagle, which speaks for itself. To the extent a response is required, Defendants admit that Asher's email included the quoted language (without any bold text or other emphasis). Defendants deny the remaining allegations in Paragraph 59 of the FAC (including, without limitation, the truth of Asher's statements in her October 31, 2025 email).

60. In a subsequent email to Mr. McGonagle, ASHER restated her concern regarding FOX's decision to provide Mr. Raj with schedule flexibility but not provide the same for her and identified numerous similarities between her show and Mr. Raj's show.

**ANSWER:** Defendants admit that Paragraph 60 of the FAC purports to summarize and characterize a second October 31, 2025 email Asher sent to McGonagle, which email speaks for itself. To the extent a response is required, Defendants admit that on October 31, 2025, Asher emailed McGonagle summarizing (among other things) what she claimed Blanton had told her about plans for the "Let

It Rip" show and scheduling considerations, her thoughts about what the demands of the show would involve in purported comparison to The Pulse show, and what she believed could be "[p]ossible solutions" to McGonagle's concerns. Defendants deny the remaining allegations in Paragraph 60 of the FAC (including, without limitation, the alleged truth of Asher's statements in her second October 31, 2025 email).

61. That same day, ASHER sent a text message to her co-anchor, Mr. Raj.

**ANSWER:** Defendants admit the allegations in Paragraph 61 of the FAC.

62. Through her text message communication to Mr. Raj, ASHER emphasized and confirmed that she had not been frustrated or upset with Mr. Raj however, ASHER expressed that she had been disappointed with FOX's unequal treatment of her based on her sex.

**ANSWER:** Defendants admit that Paragraph 62 of the FAC purports to summarize and characterize Asher's October 31, 2025 text message to Raj, which speaks for itself. To the extent a response is required, Defendants admit Asher sent Raj a text message stating (among other things) that "her anger yesterday [wa]s not directed at [him]" and "apologize[d] if it seemed personal, it's not, but it's unacceptable the double standard that they continue to create[.]" Defendants deny any remaining allegations in Paragraph 62 of the FAC (including, without limitation, the alleged truth of the Asher's statements in such text messages).

63. In response, Mr. Raj stated, in part, "I know the feeling of being treated differently than other coworkers, as that has happened to me in the past, not because of gender, but because of other issues. And I know it's important to feel like you

have an even [and] equal shot. And I know that that's what you're going to get because you won't have it any other way and I don't blame you."

**ANSWER:** Defendants admit that Paragraph 63 of the FAC purports to quote from a portion of one of Raj's October 31, 2025 text messages to Asher (which text messages speak for themselves), and further states that Asher's selective quotation from the longer conversation between them places the quoted text in Paragraph 63 of the FAC out of context in the conversation between them. Defendants deny the remaining allegations in Paragraph 63 of the FAC (including, without limitation, that Asher was treated differently than others because of her gender).

64. On or about November 3, 2025, ASHER attended a meeting with Mr. McGonagle to discuss the "Let it Rip" show and ASHER's October 31, 2025 emails.

**ANSWER:** Defendants admit the allegations in Paragraph 64 of the FAC.

65. During the meeting, ASHER complained about FOX's failure and refusal to provide the same schedule accommodations that it extended to her male counterpart, Mr. Raj.

**ANSWER:** Defendants admit that during the November 3, 2025 meeting, Asher complained that she believed she was not getting the same schedule accommodations Raj already had in place since 2024. Defendants deny the remaining allegations in Paragraph 65 of the FAC (including, without limitation, that Asher requested the same schedule adjustment as Raj).

66. Moreover, ASHER complained that FOX had been treating ASHER worse than her male counterpart because of her sex and despite the fact that she and Mr. Raj had the same workload and responsibilities.

**ANSWER:** Defendants admit that during the November 3, 2025 meeting, Asher complained that she believed she was being treated worse than Raj and that she believed she and Raj had the same workload and responsibilities. Defendants deny the remaining allegations in Paragraph 66 of the FAC (including, without limitation, the truth of Asher's alleged statements to McGonagle).

67. Further, ASHER explained that it was impractical for her to host "Let it Rip" while maintaining her existing responsibilities and without an adjustment to her schedule, similar to that which FOX had provided to Mr. Raj for "The Pulse."

**ANSWER:** Defendants admit that Asher stated in the November 3, 2025 meeting that if she was going to do "Let It Rip," she wanted to change her schedule to have Friday nights off from doing "Let It Rip" and anchoring the 10:00 p.m. and 11:00 p.m. evening newscasts. Defendants deny the remaining allegations in Paragraph 67 of the FAC (including, without limitation, the truth of Asher's alleged statements to McGonagle).

68. Nevertheless, Mr. McGonagle continued to refuse to offer ASHER the same or similar schedule adjustments as Mr. Raj.

**ANSWER:** Defendants admit that in the November 3, 2025 meeting, McGonagle did not offer Asher Friday nights off from doing "Let It Rip" or anchoring the 10:00 p.m. and 11:00 p.m. evening newscasts and explained his reasons to Asher. Defendants deny the remaining allegations in Paragraph 68 of the FAC.

69. Instead, Mr. McGonagle merely stated that FOX would put the "Let it Rip" show "on hold."

**ANSWER:** Defendants admit that in the November 3, 2025 meeting, McGonagle said to Asher words to the effect of they were not going to resolve on the eve of election night Asher's scheduling concerns about a proposed live streaming show (which they previously had discussed launching shortly after election night), and that they should put "Let It Rip" on pause. Defendants deny the remaining allegations in Paragraph 69 of the FAC.

70. On or about November 4, 2025, ASHER reported to work and prepared for her responsibilities for the evening news, which included extensive election coverage.

**ANSWER:** Defendants admit that Asher reported to work on November 4, 2025, and that her responsibilities for the evening newscasts included election coverage. Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 70 of the FAC.

71. Upon her arrival, ASHER learned that Mr. Raj had been assigned all of the guest-segment interviews for both the 5:00 p.m. and 6:00 p.m. election coverage.

**ANSWER:** Defendants admit that the 5:00 p.m. and 6:00 p.m. producers independently assigned the November 4, 2025 guest interview in their respective newscasts to Raj. Defendants lack information sufficient to form a belief as to the truth of what Asher allegedly learned and when. Defendants deny the remaining allegations in Paragraph 71 of the FAC.

72. Significantly, ASHER had previously agreed with Mr. Raj and the rest of the evening news department that the guest-segment interviews would be divided equally between her and Mr. Raj.

**ANSWER:** Defendants deny the allegations in Paragraph 72 of the FAC.

73. As a result, ASHER spoke with Traci Ditchie (Executive Producer), consistent with newsroom protocols and reporting structure.

**ANSWER:** Defendants admit that Asher spoke to Executive Producer Traci Kryscynski (formerly Ditchie) about the assignment of the guest interviews on the 5:00 p.m. and 6:00 p.m. newscasts for November 4, 2025. Defendants deny the remaining allegations in Paragraph 73 of the FAC.

74. While speaking with Ms. Ditchie, ASHER asked Ms. Ditchie why nearly all guest-segment interviews had been assigned to Mr. Raj and requested assistance in addressing the same.

**ANSWER:** Defendants admit that Asher asked Kryscynski why Raj was assigned the guest interviews for both the 5:00 p.m. and 6:00 p.m. newscasts on November 4, 2025. Defendants deny the remaining allegations in Paragraph 74 of the FAC.

75. Ms. Ditchie responded by claiming she was "busy," dismissed ASHER and ASHER's concerns, and directed ASHER to speak with a producer in the newsroom.

**ANSWER:** Defendants admit that Kryscynski told Asher that she (Asher) should talk with the producers who had assigned the 5:00 p.m. and 6:00 p.m. guest interviews for November 4, 2025. Defendants deny the remaining allegations in Paragraph 75 of the FAC.

76. Accordingly, ASHER spoke with Scott Brewer (Producer).

**ANSWER:** Defendants admit that Asher spoke with Brewer on November 4, 2025, after she talked with Kryscynski, and that Brewer was the Producer for the 6:00 p.m. newscast. Defendants deny any remaining allegations in Paragraph 76 of the FAC.

77. ASHER outlined the imbalance in assignments between her and Mr. Raj for the upcoming broadcasts and requested assistance in addressing the same.

**ANSWER:** Defendants admit Asher communicated to Brewer words to the effect of she was upset because she felt like she was left out of the booking process for the two guest interviews for the 5:00 p.m. and 6:00 p.m. newscasts on November 4, 2025, and told Brewer the assignments should be changed. Defendants deny the remaining allegations in Paragraph 77 of the FAC (including, without limitation, the truth of Asher's alleged statements to Brewer).

78. Further, ASHER reminded Mr. Brewer that the guest interview assignments were supposed to be evenly divided between ASHER and Mr. Raj.

**ANSWER:** Defendants deny the allegations in Paragraph 78 of the FAC (including, without limitation, the truth of Asher's alleged statements to Brewer).

79. Mr. Brewer advised that he would work on correcting the guest interview assignments.

**ANSWER:** Defendants admit that Brewer explained to Asher that he and the producer of the 5:00 p.m. newscast simply had not discussed guest interview assignments for their respective November 4, 2025 newscasts in advance before

assigning them, and that Brewer then reassigned the guest interview for one of the newscasts to Asher. Defendants deny the remaining allegations in Paragraph 79 of the FAC.

80. After speaking with Mr. Brewer, ASHER met with Mr. Raj.

**ANSWER:** Defendants admit that after Asher spoke with Brewer, Asher confronted Raj in his cubicle on November 4, 2025. Defendants deny the remaining allegations in Paragraph 80 of the FAC.

81. ASHER informed Mr. Raj of her concern with Mr. Raj receiving preferable treatment, with his repeated practice of claiming interview segments that otherwise would have been assigned to ASHER, and with his claiming such segments by intentionally excluding ASHER from communications.

**ANSWER:** Defendants admit that Asher made unfounded accusations to Raj that he received preferable treatment in the assignment of guest interviews and said in a confrontational manner to him, among other things, words to the effect of "You don't own politics." Defendants deny the remaining allegations in Paragraph 81 of the FAC (including, without limitation, the truth of Asher's alleged statements to Raj).

82. ASHER reminded Mr. Raj that guest interview coordination should have been a shared responsibility.

**ANSWER:** Defendants admit that Asher told Raj she believed guest interview coordination for the election day newscasts should have been their shared responsibility. Defendants deny the remaining allegations in Paragraph 82 of the FAC (including, without limitation, the truth of Asher's alleged statement to Raj).

83. Mr. Raj refused to acknowledge his repeated circumvention of ASHER's role and responsibilities.

**ANSWER:** Defendants admit that Raj did not agree with Asher's unfounded accusations about him. Defendants deny the remaining allegations in Paragraph 83 of the FAC.

84. Soon thereafter, ASHER spoke with Ms. Lee.

**ANSWER:** Defendants admit the allegations in Paragraph 84 of the FAC.

85. ASHER explained to Ms. Lee the disparate treatment she had been experiencing (i.e., Mr. Raj being assigned the vast majority of guest interviews and Mr. Raj and multiple others excluding her from decision-making processes).

**ANSWER:** Defendants admit that while in Lee's office on November 4, 2025 (for the first time that day), Asher complained to Lee that she (Asher) believed Raj was being assigned more guest interviews than Asher was. Defendants deny the remaining allegations in Paragraph 85 of the FAC (including, without limitation, the truth of Asher's alleged statements to Lee).

86. Despite ASHER's explanation of the ongoing disparate treatment she experienced, Ms. Lee dismissed ASHER's concerns and erroneously claimed that ASHER and Mr. Raj had been treated equally.

**ANSWER:** Defendants admit that Lee told Asher that she (Lee) did not believe Asher and Raj were being treated differently. Defendants deny the remaining allegations in Paragraph 86 of the FAC (including, without limitation, the truth of Asher's alleged statements to Lee).

87. Later that evening, while on set, ASHER received an email from Dalina Hayes (Director of Human Resources) requesting that ASHER contact her on November 5, 2025.

**ANSWER:** Defendants admit that on the evening of November 4, 2025, Hayes emailed Asher asking Asher to call her, and that Hayes held the title Director of Human Resources. Defendants further admit that Asher was on the newsroom set at various times during the evening of November 4, 2025. Defendants deny the remaining allegations in Paragraph 87 of the FAC.

88. After receiving the communication from Ms. Hayes, ASHER once again met with Ms. Lee.

**ANSWER:** Defendants admit the allegations in Paragraph 88 of the FAC.

89. While meeting with Ms. Lee, ASHER restated her concern with the unequal treatment as between Mr. Raj and her.

**ANSWER:** Defendants admit that in her first meeting with Lee on November 4, 2025 (before Hayes's November 4, 2025 email to Asher), Asher expressed to Lee her unfounded complaints about her perception of Raj's guest interview assignments. Defendants deny the remaining allegations in Paragraph 89 of the FAC (including, without limitation, the truth of Asher's alleged statements to Lee).

90. Further, ASHER questioned why she (ASHER) had been contacted by FOX's human resources department.

**ANSWER:** Defendants admit that in her second meeting with Lee on November 4, 2025 (after Hayes's November 4, 2025 email to Asher), Asher asked

Lee why she (Asher) had been contacted by Hayes. Defendants deny any remaining allegations in Paragraph 90 of the FAC.

91. Ms. Lee refused to provide a reason regarding why Ms. Hayes contacted ASHER.

**ANSWER:** Defendants admit that Lee told Asher that she (Lee) could not say or did not know why Hayes had contacted Asher, and that Asher should ask Hayes directly. Defendants deny the remaining allegations in Paragraph 91 of the FAC.

92. On or about November 5, ASHER was directed to attend a meeting with Ms. Hayes and Mr. Blanton.

**ANSWER:** Defendants admit that Asher was directed to attend a meeting with Hayes and Blanton on November 5, 2025. Defendants deny any remaining allegations in Paragraph 92 of the FAC.

93. During the meeting, Ms. Hayes and Mr. Blanton advised that FOX was placing ASHER on leave pending an investigation into alleged complaints of "egregious behavior" based on ASHER's communications with Mr. Dulberg and ASHER's interactions with FOX employees on November 4.

**ANSWER:** Defendants admit that Hayes told Asher on November 5, 2025, that Asher was being placed on paid leave during an internal investigation of multiple complaints made by other employees (including Dulberg) about Asher's unprofessional behavior directed toward multiple employees in the preceding week. Defendants further admit that the complaints from such other employees included complaints about Asher's shouting at other employees in the newsroom about the

order of guest interviews during one of the evening newscasts after Asher was the one who had misread the schedule; Asher's repeated use of profanity directed to (and similar confrontational and disrespectful interactions with) other employees; and Asher's confrontation with an employee whom she believed had complained to management about her. Defendants lack information sufficient to form a belief as to the truth of the allegation regarding whether Hayes or Blanton used the specific words "egregious behavior" during this meeting. Defendants deny any remaining allegations in Paragraph 93 of the FAC.

94. Further, Ms. Hayes and Mr. Blanton claimed that ASHER appeared "upset" on-air after a production error occurred during the November 4, 2025 broadcast of election coverage.

**ANSWER:** Defendants admit that Asher appeared upset while on the air during the November 4, 2025 broadcast of election coverage, after Asher's outbursts in the newsroom. Defendants deny the remaining allegations in Paragraph 94 of the FAC.

95. ASHER's job performance during the November 4, 2025 Election Day broadcast was exemplary.

**ANSWER:** Defendants deny the allegations in Paragraph 95 of the FAC.

96. Significantly, upon information and belief, FOX had not, at any time prior, placed any on-air employee on leave pending an "investigation" into the employee.

**ANSWER:** Defendants admit that, prior to receiving the employee complaints about Asher's behavior, McGonagle and Hayes had not had to place any

lead news anchor at Fox 2 Detroit on leave pending an investigation into such individual's conduct. Defendants deny the remaining allegations in Paragraph 96 of the FAC.

97. FOX nevertheless placed ASHER on leave.

**ANSWER:** Defendants admit Asher was placed on paid leave while Defendants were investigating the employee complaints about her behavior. Defendants deny any remaining allegations in Paragraph 97 of the FAC.

98. Upon information and belief, on or about November 5, Mr. Raj contacted FOX's human resources department, offensively labeled ASHER as "jealous," and grossly mischaracterized ASHER's complaints of sex-based discrimination as ASHER "[having] an issue with men vs. women."

**ANSWER:** Defendants admit that on or about November 5, 2025, Raj spoke with Hayes regarding his concerns about the negative impacts of Asher's unprofessional conduct and disrespectful treatment on him and other employees. Defendants further admit that when discussing his concerns with Hayes, Raj expressed his concerns, including his concern that Asher was jealous of him and that it was coming across to others in Asher's negativity, and that, based on her comments, Asher seemed to have an issue with men versus women. Defendants deny the remaining allegations in Paragraph 98 of the FAC.

99. On or about November 14, 2025, ASHER attended a meeting with Mr. Blanton and Ms. Hayes.

**ANSWER:** Defendants admit the allegations in Paragraph 99 of the FAC.

100. During the meeting, ASHER was accompanied by representatives from the Screen Actors Guild and the American Federation of Television and Radio Artists Union (the "Union").

**ANSWER:** Defendants deny the allegations in Paragraph 100 of the FAC.

101. During the meeting, Ms. Hayes and Mr. Blanton continued to erroneously assert that ASHER had engaged in unprofessional conduct and claimed that ASHER's alleged use of profanity constituted unprofessional conduct.

**ANSWER:** Defendants admit that Hayes and Blanton told Asher (among other things) that Asher had engaged in unprofessional conduct, including but not limited to her shouting at and confronting other employees and her use of profanity. Defendants deny the remaining allegations in Paragraph 101 of the FAC.

102. Throughout the meeting, ASHER and her Union representatives repeatedly emphasized that ASHER had not engaged in unprofessional conduct warranting disciplinary action and had, instead, been objecting to and complaining about FOX's routine discriminatory treatment of ASHER based on her sex.

**ANSWER:** Defendants admit that during the November 14, 2025 meeting, Asher stated (among other things) that she was frustrated and did not intend for her behavior involving Dulberg on October 30, 2025 to be disrespectful. Defendants deny the remaining allegations in Paragraph 102 of the FAC.

103. On or about November 21, 2025, Mr. Blanton and Ms. Hayes contacted ASHER by phone.

**ANSWER:** Defendants admit the allegations in Paragraph 103 of the FAC.

104. During the call, Mr. Blanton stated that, after the two-week investigation, FOX had determined that "[November 21, 2025] would be [ASHER's] last day at Fox 2," thereby ending ASHER's employment.

**ANSWER:** Defendants admit Blanton told Asher on November 21, 2025, that, based on the internal investigation and the information gathered, it was determined that November 21, 2025 would be Asher's last day. Defendants deny the remaining allegations in Paragraph 104 of the FAC.

105. Upon information and belief, Jack Abernethy (Chief Executive Officer of Fox TV) authorized and approved ASHER's termination.

**ANSWER:** Defendants deny the allegations in Paragraph 105 of the FAC.

106. Mr. Blanton and Ms. Hayes advised that FOX decided to end ASHER's employment based on accusations that ASHER had engaged in alleged "outbursts."

**ANSWER:** Defendants admit Blanton told Asher on November 21, 2025 that based on the internal investigation and the information gathered, Asher would not be returning due to her repeated outbursts in the newsroom and multiple instances of unprofessional conduct with her colleagues. Defendants deny any remaining allegations in Paragraph 106 of the FAC.

107. Significantly, at no time did ASHER engage in "outbursts" or engage in unprofessional conduct warranting disciplinary action or termination.

**ANSWER:** Defendants deny the allegations in Paragraph 107 of the FAC.

108. During the call, Mr. Blanton advised that FOX would send ASHER a termination letter.

**ANSWER:** Defendants deny the allegations in Paragraph 108 of the FAC.

109. FOX did not provide ASHER with a termination letter at that time.

**ANSWER:** Defendants admit Asher was not provided a termination letter on November 21, 2025. Defendants deny any remaining allegations in Paragraph 109 of the FAC.

110. At the time of ASHER's termination, ASHER's Employment Agreement with FOX contained a "Covenant Not To Compete" stating that ASHER could not render media services in the same "Designated Market Area" as FOX, for 6 months, "Following the end of [ASHER's] employment with [FOX] . . ."

**ANSWER:** Defendants admit that Paragraph 110 of the FAC purports to summarize, characterize, and/or quote portions of Asher's Employment Agreement, which speaks for itself. To the extent a response is required, Defendants admit that the quoted language appears as part of certain provisions in Asher's Employment Agreement. Defendants deny any remaining allegations in Paragraph 110 of the FAC (including, without limitation, that Asher's employment was terminated on November 21, 2025).

111. On or about November 25, 2025, ASHER's Union attorney contacted FOX on ASHER's behalf seeking reinstatement of ASHER's employment and noting that FOX had continued to broadcast promotional materials and advertisements featuring ASHER.

**ANSWER:** Defendants admit that Paragraph 111 of the FAC purports to summarize and characterize written correspondence, which speaks for itself. To the extent a response is required, Defendants admit that on or about November 24, 2025, an attorney for Asher's union contacted Fox regarding her work status. Defendants deny the remaining allegations in Paragraph 111 of the FAC.

112. FOX declined to reinstate ASHER.

**ANSWER:** Defendants admit that Paragraph 111 of the FAC purports to summarize and characterize written correspondence, which speaks for itself. To the extent a response is required, Defendants admit that, in accordance with the terms of Asher's Employment Agreement, they chose not to utilize her services on the air while continuing to employ Asher, pay her wages, and provide her employee benefits. Defendants deny the remaining allegations in Paragraph 112 of the FAC (including, without limitation, that Asher's employment was terminated as of November 25, 2025).

113. On or about November 28, 2025, ASHER communicated with FOX, through counsel, regarding her termination of employment.

**ANSWER:** Defendants admit that Paragraph 111 of the FAC purports to summarize and characterize written correspondence, which speaks for itself. Further, the allegations in Paragraph 113 of the FAC reference confidential settlement communications to which no response is required. To the extent a response is required, Defendants admit that Asher's then-current counsel contacted counsel for Defendants regarding her work status. Defendants deny any remaining allegations in Paragraph 113 of the FAC (including, without limitation, that Asher's employment had been terminated as of November 28, 2025).

114. Thereafter, FOX erroneously claimed that it had not terminated ASHER; however, FOX refused to allow ASHER to return to work while at the same

time continuing to broadcast promotional materials and advertisements featuring ASHER.

**ANSWER:** Defendants admit that NWCD had not terminated Asher's employment as of November 28, 2025, and further admits that, in accordance with the terms of Asher's Employment Agreement, NWCD chose not to utilize her services on the air while continuing to employ Asher, pay her wages, and provide her employee benefits. Defendants further admit that Asher was not immediately removed from all Fox 2 Detroit broadcast promotional materials and advertisements. Defendants deny the remaining allegations in Paragraph 114 of the FAC.

115. FOX subsequently informed ASHER that her employment with FOX would end in June 2026 and that FOX would not renew ASHER's employment agreement with FOX.

**ANSWER:** Defendants admit that Paragraph 115 of the FAC purports to summarize and characterize Asher's May 28, 2026 termination notice, which speaks for itself. To the extent a response is required, Defendants admit that Asher's May 28, 2026 termination notice states (among other things):

> Pursuant to paragraph 20(b) of the Standard Terms to your May 21, 2024 employment agreement ("Employment Agreement") and our November 21, 2025 conversation, New World Communications of Detroit, Inc. ("NWCD") is terminating the Employment Agreement for cause. The effective date of the termination of the Employment Agreement and your employment is June 5, 2026.

Defendants deny the remaining allegations in Paragraph 115 of the FAC.

116. FOX, on numerous occasions, has permitted, tolerated, and/or ignored unprofessional behavior and misconduct by multiple male employees without suspending or terminating those male employees, including but not limited to:

a. Mr. Raj: In or about December 2012, Mr. Raj was arrested for Driving Under the Influence. FOX merely suspended Mr. Raj for two weeks and granted him numerous promotions thereafter.

b. Mr. McGonagle: In or about November 2018, Mr. McGonagle was arrested for Driving While Intoxicated while working for FOX's WTTG station. FOX later promoted Mr. McGonagle.

c. Charlie LeDuff: Mr. LeDuff worked as an on-air journalist for the Fox 2 Detroit news until 2016. In or about 2013, Mr. LeDuff was cited for aggravated assault in connection with an incident wherein he bit a security guard. FOX did not terminate Mr. LeDuff's employment.

d. A male employee working as FOX's Vice President of Streaming Content repeatedly exhibited severe anger issues and violent tendencies, including constantly shouting "Fuck" and other profanities at employees and kicking a trash can in the office. Upon information and belief, this individual was not terminated for this behavior.

e. During a meeting between FOX's human resources department and representatives from the Union, the attendees discussed a male employee who shouted "Fuck" at a coworker. The male employee was not terminated and was later promoted.

f. In or about 2024, a longtime male anchor was the subject of multiple complaints concerning sexually inappropriate comments made in the newsroom and the studio. FOX did not terminate this male anchor and, instead, issued him a warning.

g. In or about 2025, two male producers were reported for egregious sexual harassment of a female morning news anchor. FOX did not terminate either male producer. Instead, FOX offered each the option to transfer to different roles.

**ANSWER:** Defendants admit that Raj was suspended with pay for two weeks in 2010, and that Raj was promoted at times after 2010. Defendants further admit that McGonagle was arrested for driving while intoxicated in 2018 (which was later expunged) and that McGonagle did receive a promotion after 2018. Defendants admit that Charles LeDuff was an on-air journalist for the Fox 2 Detroit news until 2016 (and therefore was not terminated in 2013), and that LeDuff was disciplined in 2013 for his involvement in a physical altercation and making comments to off-duty police officers. Defendants admit that in or around 2025, two male producers were reported for allegedly engaging in harassing behavior toward a female news anchor and that Fox did not terminate these producers because one resigned before disciplinary action and the other received significant disciplinary action. Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 116(e) of the FAC. Defendants deny the remaining allegations in Paragraph 116 of the FAC (including, without limitation, that they have "permitted, tolerated, and/or ignored unprofessional behavior and misconduct by multiple male employees").

117. On or about March 16, 2026, ASHER filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

**ANSWER:** Defendants admit the allegations in Paragraph 117 of the FAC.

118. On or about May 11, 2026, the EEOC issued ASHER a Notice of Right to Sue.

**ANSWER:** Defendants admit the allegations in Paragraph 118 of the FAC.

119. Since FOX ended ASHER's employment on November 21, 2025, ASHER's six-month, post-employment "Covenant Not To Compete" obligations expired on May 21, 2026, as consistent with her Employment Agreement with FOX.

**ANSWER:** Defendants deny the allegations in Paragraph 119 of the FAC.

120. On or about May 28, 2026, FOX sent ASHER a letter stating that it was "terminating [ASHER's] Employment Agreement" effective June 5, 2026.

**ANSWER:** Defendants admit that Paragraph 120 of the FAC purports to summarize, characterize, and/or quote Asher's May 28, 2026 termination notice, which speaks for itself. To the extent a response is required, Defendants admit that Defendants admit that Asher's May 28, 2026 termination notice states (among other things):

> Pursuant to paragraph 20(b) of the Standard Terms to your May 21, 2024 employment agreement ("Employment Agreement") and our November 21, 2025 conversation, New World Communications of Detroit, Inc. ("NWCD") is terminating the Employment Agreement for cause. The effective date of the termination of the Employment Agreement and your employment is June 5, 2026.

Defendants deny any remaining allegations in Paragraph 120 of the FAC.

121. FOX has since indicated that the company intends to enforce against ASHER the post-employment non-competition obligations for the six-month period after June 5, 2026, despite the expiration of those obligations on May 21, 2026.

**ANSWER:** Defendants admit that their position is that Asher remains obligated to comply with the contractual obligations to which she agreed in her Employment Agreement. Defendants deny the remaining allegations in Paragraph

121 of the FAC (including, without limitation, that Asher's non-competition obligations expired on May 21, 2026).

**COUNT I: SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

**AND**

**COUNT II: SEX DISCRIMINATION IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT**

122. ASHER incorporates Paragraphs 1 through 121.

**ANSWER:** Defendants restate and incorporate their answers to Paragraphs 1 through 121 as if fully set forth herein.

123. Title VII prohibits employers from discriminating against any individual regarding the compensation, terms, conditions, or privileges of employment because of the employee's sex. 42 U.S.C. § 2000e-2(a)(1).

**ANSWER:** The allegations in Paragraph 123 of the FAC contain legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Title VII prohibits (among other things) discrimination against employees of employers (each as defined under Title VII) on the basis of the employee's sex. Defendants deny any remaining allegations in Paragraph 123 of the FAC (including, without limitation, any allegation that Defendants violated Title VII with respect to Asher or otherwise).

124. The ELCRA prohibits employers from discriminating against any individual regarding the compensation, terms, conditions, or privileges of employment, because of the employee's sex. MCL § 37.2202(1)(a).

**ANSWER:** The allegations in Paragraph 124 of the FAC contain legal conclusions to which no response is required. To the extent a response is required, Defendants admit the ELCRA prohibits (among other things) discrimination against employees of employers (each as defined under the ELCRA) on the basis of the employee's sex. Defendants deny any remaining allegations in Paragraph 124 of the FAC (including, without limitation, any allegation that Defendants violated the ELCRA with respect to Asher or otherwise).

125. Defendant Fox TV and Defendant NWCD are employers within the meaning of Title VII and the ELCRA. *See* 42 U.S.C. § 2000e(b); MCL § 37.2201(a).

**ANSWER:** The allegations in Paragraph 125 of the FAC contain legal conclusions to which no response is required. To the extent a response is required, Defendants admit that they are "employers" as that term is defined in Title VII and the ELCRA. Defendants deny any remaining allegations in Paragraph 125 of the FAC.

126. At all relevant times, Defendants had a duty under Title VII and the ELCRA not to discharge or otherwise discriminate against ASHER because of her sex (female).

**ANSWER:** The allegations in Paragraph 126 of the FAC contain legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Title VII and the ELCRA prohibit (among other things) discrimination against Asher on the basis of her sex. Defendants deny any remaining allegations in Paragraph 126 of the FAC (including, without limitation, any

allegation that Defendants violated Title VII and/or the ELCRA with respect to Asher or otherwise).

127. Defendants violated ASHER's civil rights by discriminating against ASHER because of her sex, which discrimination includes, but is not limited to:

a. Refusing to provide ASHER with the same schedule accommodations that Defendants provided to ASHER's similarly-situated male counterpart, Mr. Raj, for ASHER's performance of similar responsibilities.

b. Assigning ASHER fewer guest interviews than her similarly situated male counterpart.

c. Excluding ASHER from communications related to guest-segment interviews and the November 2025 election coverage broadcasts.

d. Failing and refusing to ensure ASHER received equal (i.e., not disparate) treatment to that of her similarly-situated male counterpart, Mr. Raj.

e. Summarily dismissing and refusing to meaningfully investigate ASHER's complaints of disparate treatment and discrimination based on sex.

f. Permitting ASHER's similarly-situated male counterpart, Mr. Raj, to circumvent and undermine ASHER and ASHER's employment responsibilities.

g. Terminating ASHER's employment based on clearly erroneous allegations of conduct that, even taken as true, are substantially less severe than conduct which similarly-situated male employees engaged in without similar adverse action.

h. Otherwise treating similar-situated male employees more favorably than ASHER.

**ANSWER:** Defendants deny the allegations in Paragraph 127 of the FAC.

128. If ASHER had not been female, she would not have been treated in the same discriminatory manner.

**ANSWER:** Defendants deny the allegations in Paragraph 128 of the FAC.

129. As a direct and proximate result of Defendants' violations of Plaintiff's civil rights, ASHER has suffered damages, including but not limited to, loss of past and future income and employee benefits, mental anguish and emotional distress, loss of professional reputation and esteem, attorney fees, costs, and interest.

**ANSWER:** Defendants deny the allegations in Paragraph 129 of the FAC.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter Judgment against Defendants, in whatever amount is shown to be established by the proofs in this cause, including lost past and future wages, lost benefits, mental and emotional distress damages, loss of professional reputation and esteem, and punitive damages, together with interest, costs, and attorneys' fees.

**ANSWER:** Defendants admit that Asher seeks relief as set forth in the foregoing request for relief regarding Counts I and II, but deny that Asher is entitled to any type of remedy, relief, or damages, including the relief requested therein.

## COUNT III: RETALIATION FOR OPPOSING SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

## AND

## COUNT IV: RETALIATION FOR OPPOSING SEX DISCRIMINATION IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT

130. ASHER incorporates Paragraphs 1 through 121.

**ANSWER:** Defendants restate and incorporate their answers to Paragraphs 1 through 121 as if fully set forth herein.

131. Title VII prohibits an employer from retaliating or discriminating against an employee because the employee has opposed an unlawful employment practice under Title VII. 42 U.S.C. § 2000e-3(a).

**ANSWER:** The allegations in Paragraph 131 of the FAC contain legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Title VII prohibits (among other things) retaliation or discrimination against employees of employers (each as defined under Title VII) because the employee has opposed an unlawful employment practice under Title VII. Defendants deny any remaining allegations in Paragraph 131 of the FAC (including, without limitation, any allegation that Defendants violated Title VII with respect to Asher or otherwise).

132. The ELCRA prohibits a person from retaliating or discriminating against an individual because the individual has opposed a violation of the ELCRA. MCL § 37.2701(a).

**ANSWER:** The allegations in Paragraph 132 of the FAC contain legal conclusions to which no response is required. To the extent a response is required, Defendants admit that the ELCRA prohibits (among other things) retaliation or discrimination against employees of employers (each as defined under the ELCRA) because the employee has opposed an unlawful employment practice under the ELCRA. Defendants deny any remaining allegations in Paragraph 132 of the FAC (including, without limitation, any allegation that Defendants violated the ELCRA with respect to Asher or otherwise).

133. Defendants are employers within the meaning of Title VII. 42 U.S.C. § 2000e(b).

**ANSWER:** The allegations in Paragraph 133 of the FAC contain legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Defendants are "employers" as that term is defined in Title VII. Defendants deny any remaining allegations in Paragraph 133 of the FAC.

134. Defendants together and/or individually constitute a "person" within the meaning of the ELCRA. MCL § 37.2103(h).

**ANSWER:** The allegations in Paragraph 134 of the FAC contain legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Defendants are "persons" as that term is defined in the ELCRA. Defendants deny the remaining allegations in Paragraph 134 of the FAC.

135. It is a violation of Title VII and the ELCRA for an employer to discriminate against an individual because of the individual's sex. 42 U.S.C. § 2000e-2(a)(1); MCL § 37.2202(1)(a).

**ANSWER:** The allegations in Paragraph 135 of the FAC contain legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Title VII and the ELCRA prohibit (among other things) discrimination against employees of employers (each as defined under the respective statutes) on the basis of the employee's sex. Defendants deny any remaining allegations in Paragraph 135 of the FAC (including, without limitation, any allegation that Defendants violated Title VII and/or the ELCRA with respect to Asher or otherwise).

136. Defendants violated Title VII and the ELCRA when they discriminated against ASHER because of her sex.

**ANSWER:** Defendants deny the allegations in Paragraph 136 of the FAC.

137. ASHER opposed Defendants' violations of Title VII and ELCRA by repeatedly informing Defendants and Defendants' employees of numerous incidents wherein ASHER was discriminated against because of her sex and treated less favorably because of her sex.

**ANSWER:** Defendants admit that Asher made allegations on at least one occasion to one or more employees of a Defendant claiming that she was treated less favorably because of her sex. Defendants deny the remaining allegations in Paragraph 137 of the FAC (including, without limitation, the truth of Asher's alleged statements and that Defendants violated Title VII or ELCRA with respect to Asher or otherwise).

138. At all relevant times, Defendants had a duty under Title VII and the ELCRA not to retaliate or discriminate against ASHER because of her opposition to Defendants' violations of Title VII and the ELCRA.

**ANSWER:** The allegations in Paragraph 138 of the FAC contain legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Title VII prohibits (among other things) retaliation against Asher to the extent (if any) she opposed alleged violations of Title VII, and further admit that ELCRA prohibits (among other things) retaliation against Asher to the extent (if any) she opposed alleged violations of ELCRA. Defendants deny any remaining allegations in Paragraph 138 of the FAC (including, without limitation,

any allegation that Defendants violated Title VII and/or the ELCRA with respect to Asher or otherwise).

139. Defendants violated ASHER's civil rights by retaliating against ASHER her opposition to Defendants' violations of Title VII and the ELCRA, which included but was not limited to:

a. Suspending ASHER from her position as News Anchor.

b. Subjecting ASHER to an investigation predicated upon erroneous allegations.

c. Refusing to reinstate ASHER into her position as News Anchor.

d. Terminating ASHER's employment.

**ANSWER:** Defendants deny the allegations in Paragraph 139 of the FAC.

140. As a direct and proximate result of Defendants' violations of ASHER's civil rights, ASHER has suffered damages, including but not limited to, loss of past and future income and employee benefits, mental anguish and emotional distress, and loss of professional reputation and esteem, attorney fees, costs, and interest.

**ANSWER:** Defendants deny the allegations in Paragraph 140 of the FAC.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter Judgment against Defendants, in whatever amount is shown to be established by the proofs in this cause, including lost past and future wages, lost benefits, mental and emotional distress damages, loss of professional reputation and esteem, and punitive damages, together with interest, costs, and attorneys' fees.

**ANSWER:** Defendants admit that Asher seeks relief as set forth in the foregoing request for relief regarding Counts III and IV, but deny that Asher is entitled to any type of remedy, relief, or damages, including the relief requested therein.

## COUNT V: DECLARATORY JUDGMENT AS TO ENFORCEMENT OF COVENANT NOT TO COMPETE

141. ASHER incorporates Paragraphs 1 through 121.

**ANSWER:** Defendants restate and incorporate their answers to Paragraphs 1 through 121 as if fully set forth herein.

142. Pursuant to 28 U.S.C. § 2201, ASHER is entitled to seek this Court's Declaration that the 6-month Covenant Not To Compete contained within the Employment Agreement between ASHER and Defendants expired and is no longer applicable to ASHER.

**ANSWER:** The allegations in Paragraph 142 contain legal conclusions to which no response is required. To the extent a response is required, Defendants admit that under 28 U.S.C. § 2201, an interested party may seek a declaratory judgment. Defendants deny the remaining allegations in Paragraph 142 of the FAC.

143. ASHER entered into an Employment Agreement with Defendants whereby ASHER agreed to not engage in competitive activities during the course of her employment with Defendants, and for the six-month period immediately "following the end of [ASHER's] employment with [FOX] . . ."

**ANSWER:** Defendants admit that Paragraph 143 of the FAC purports to summarize, characterize, and/or quote portions of Asher's Employment Agreement, which speaks for itself. To the extent a response is required, Defendants admit that Asher's Employment Agreement states (among other things) that "if this Agreement is terminated by [NWCD] as a result of a Cause for Termination, then [Asher] shall not appear on any such programming" that meets specific criteria set forth in the Employment Agreement "for the period of time that this Agreement would have

been in effect had it not been so terminated, or for 6 months following said termination, whichever is the later." Defendants deny the remaining allegations in Paragraph 143 of the FAC.

144. Defendants ended ASHER's employment on November 21, 2025 by pulling ASHER off of the air and removing from ASHER the job duties and functions that were expressly enumerated in her Employment Agreement.

**ANSWER:** Defendants deny the allegations in Paragraph 144 of the FAC.

145. Thereafter, Defendants refused to allow ASHER to return to work and perform the enumerated responsibilities of her position.

**ANSWER:** Defendants admit that Asher was not allowed to return to work to perform her prior responsibilities after November 21, 2025, and further admit that Asher requested and was approved for an employee medical leave of absence from December 2025 through February 2026, and until the June 5, 2026 termination of her employment, NWCD continued to employ her, pay her wages, and provide her employee benefits in accordance with the terms of her Employment Agreement. Defendants deny any remaining allegations in Paragraph 145 of the FAC.

146. ASHER abided by her contractual obligations by not engaging in competitive activities for the six months following Defendants' ending her employment.

**ANSWER:** The allegations in Paragraph 146 of the FAC contain legal conclusions to which no response is required. To the extent a response is required, Defendants lack information sufficient to form a belief as to the truth of the allegations regarding whether Asher abided her contractual non-competition

obligations. Defendants deny the remaining allegations in Paragraph 146 of the FAC (including, without limitation, that six months have passed since Asher's termination).

147. ASHER's obligations not to compete, pursuant to her Employment Agreement, ended on May 21, 2026 (i.e., six months after the date of the end of her employment).

**ANSWER:** The allegations in Paragraph 147 of the FAC contain legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 147 of the FAC (including, without limitation, that six months have passed since Asher's termination).

148. Nevertheless, Defendants have asserted that they intend to enforce the Covenant Not To Compete for a period of six months beginning on or about June 6, 2026.

**ANSWER:** Defendants admit that their position is that Asher remains obligated to comply with the contractual obligations to which she agreed in her Employment Agreement. Defendants deny the remaining allegations in Paragraph 148 of the FAC.

149. As a result of ASHER's and Defendant's conflicting positions, an actual, justiciable controversy exists between ASHER and Defendants, who each have adverse legal interests, regarding the commencement, duration, and present enforceability of the Covenant Not To Compete.

**ANSWER:** The allegations in Paragraph 149 of the FAC contain legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 149 of the FAC.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a. Declare that Defendant ended Plaintiff's employment on November 21, 2025;

b. Declare that the six-month, post-employment Covenant Not To Compete commenced on November 21, 2025 and expired on or about May 21, 2026;

c. Declare that the Covenant Not To Compete is expired and no longer enforceable against Plaintiff;

d. Award Plaintiff her costs and attorneys' fees as permitted by law, and such other relief as this Court deems just and proper.

**ANSWER:** Defendants admit that Asher seeks relief as set forth in the foregoing request for relief regarding Count V, but deny that Asher is entitled to any type of remedy, relief, or damages, including the relief requested therein.

## AFFIRMATIVE AND OTHER DEFENSES

Defendants assert the following defenses without conceding they have the burden of proof on the defenses set forth below to the extent they are not affirmative defenses for which a defendant has the burden of proof under applicable law.

1. Asher's claims are not actionable because the challenged employment decisions are justified by legitimate, non-discriminatory, non-retaliatory, and non-pretextual business reasons (namely, her unprofessional workplace behavior and outbursts including, but not limited to, conduct similar to that for which she had previously received a warning in a December 13, 2023 Notice of Suspension and Employee Assistance Program Referral issued to her).

2. Defendants deny that they were motivated by any impermissible motive in any decision or action concerning Asher, but affirmatively plead that they would have made the same decisions or taken the same actions in the absence of any impermissible motive due to Asher's unprofessional workplace behavior.

3. Asher's claims are barred in whole or in part to the extent that the alleged rights, obligations, or duties asserted in the FAC are preempted in whole or in part by, or otherwise require an interpretation of, the collective bargaining agreement applicable to Asher's employment.

4. Asher's claims, to the extent she asserts any outside the scope of the claims in her March 16, 2026 Charge of Discrimination, are barred to the extent she failed to exhaust administrative remedies and/or satisfy some or all conditions precedent required to bring such claims.

5. Defendants exercised reasonable care to prevent and promptly correct any alleged discriminatory conduct, by, among other things, providing regular training to supervisors and managers regarding Defendants' policies against discrimination and retaliation, making such policies against discrimination and retaliation accessible to Asher and other employees, encouraging employees to report inappropriate conduct, investigating reports of inappropriate conduct, and taking, where appropriate, steps to correct such conduct.

6. Defendants deny that any of their employees or agents, acting within the course and scope of their employment or agency, violated any statute, regulation, constitutional provision, common law or public policy or caused any damage or injury to Asher. Any unlawful conduct allegedly engaged in by Defendants' employees, supervisory or otherwise, was outside the scope of their employment, contrary to Defendants' policies, and was not ratified, confirmed, or approved by Defendants.

7. Defendants consistently maintained, implemented, and enforced policies in the workplace against discrimination and retaliation, and otherwise exercised reasonable care to prevent and correct promptly any claims of alleged discrimination or retaliation. Asher unreasonably failed to take advantage of preventive and corrective opportunities or to avoid harm otherwise.

8. Defendants cannot be liable for punitive damages to Asher, including without limitation, because any wrongful conduct that Asher may prove to have suffered was contrary to Defendants' good faith efforts to comply with the law and prevent discrimination and retaliation in the workplace, and because Defendants did not act with malice or reckless indifference to Asher's legally protected rights.

9. An award of punitive damages under the circumstances of this case would constitute an excessive fine and otherwise would be in violation of Defendants' due process and other rights under the United States Constitution,

including without limitation, because Defendants have policies against discrimination and retaliation.

10. An award of punitive damages is unavailable under the circumstances of this case for some or all of the causes of action Asher asserts, including under the ELCRA.

11. Any emotional distress allegedly suffered by Asher was not caused by Defendants or any of their agents.

12. Asher's declaratory action claim is barred, in whole or in part, by the doctrines of unclean hands, laches and estoppel because Asher alleges her employment was terminated effective November 21, 2025, but inconsistent with that allegation, continued to accept wages, employee benefits, and other employee leave of absence benefits from one or more of the Defendants from November 22, 2025 through June 5, 2026.

13. Asher's declaratory action claim is barred, in whole or in part, by the doctrine of waiver because Asher alleges her employment was terminated effective November 21, 2025, but inconsistent with her allegation, continued to accept of wages, employee benefits, and other employee leave of absence benefits from one or more of the Defendants from November 22, 2025 through June 5, 2026.

14. Asher's claims for damages are barred or diminished to the extent she has failed to mitigate or otherwise minimize her damages.

15. Asher has failed, in whole or in part, to state a claim upon which relief can be granted.

16. Asher's claims may be barred, in whole or in part, because any damages or losses that Asher has alleged, if they exist at all, were proximately caused or contributed to by the conduct of Asher.

17. To the extent that Asher has received any income from any Defendant to which she was not entitled, or income from other employment or any other sources, such monies must be offset against any damages Asher claims are owed by Defendants.

18. To the extent during the course of this litigation Defendants acquire any evidence of additional wrongdoing by Asher, which wrongdoing would have materially affected the terms and conditions of Asher's employment or otherwise led to disciplinary action up to and including termination, such after acquired evidence shall bar Asher on liability and/or damages or shall reduce any right to relief as provided by law.

**WHEREFORE**, Defendants respectfully submit that the claims asserted against Defendants in the FAC should be dismissed, with prejudice, in their entirety, and that Defendants should be awarded their attorneys' fees and costs incurred in defending this action as well as such other and further relief as the Court may deem just and proper.

## COUNTERCLAIMS AGAINST COUNTER-DEFENDANT TARYN ASHER

Defendants/Counter-Plaintiffs Fox Television Stations, LLC ("Fox") and New World Communications of Detroit, Inc., owner and operator of television station WJBK-TV ("NWCD"), by and through its undersigned counsel, hereby asserts its counterclaims (the "Counterclaims") against Plaintiff/Counter-Defendant Taryn Asher ("Asher") and alleges as follows:

## PARTIES

1. Fox is a Delaware corporation with its principal place of business in the City of Los Angeles, Los Angeles County, California.

2. NWCD is a Delaware corporation and with its principal place of business in Southfield, Oakland County, Michigan. NWCD is a wholly-owned subsidiary of Fox.

3. On information and belief, Plaintiff Taryn Asher resides in the City of Birmingham, Oakland County, Michigan.

## JURISDICTION AND VENUE

4. This Court has supplemental jurisdiction over these Counterclaims under 28 U.S.C. § 1367 because the claims asserted herein are sufficiently related to the claims asserted in Asher's First Amended Complaint ("FAC") that they form part of the same case or controversy. Specifically, both the Counterclaims and the

allegations in the FAC concern Asher's employment with, and termination from, NWCD.

5. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the alleged events giving rise to the Counterclaims are alleged to have occurred in this District.

## FACTS

### Asher Failed To Return Her Company-Issued Laptop Following Her Termination for Cause

6. Asher was employed as a reporter or a news anchor for the Fox 2 Detroit news program on WJBK-TV from 2007 until the termination of her employment.

7. During Asher's employment, Defendants provided Asher with a company-issued Hewlett-Packard laptop (Serial No. 5CG30344WF) (hereinafter referred to as the "Laptop").

8. Asher's employment was terminated for cause due to her unprofessional workplace behavior and outbursts including, but not limited to, conduct similar to that for which she had previously received a warning in a December 13, 2023 Notice of Suspension and Employee Assistance Program Referral issued to her.

**Policies On Employees' Use of Company Systems and Property That Establish Employees Have No Reasonable Expectation of Privacy and <u>Return of Company Property Requirements</u>**

9. At all relevant times, Defendants maintained an Electronic Communications Policy ("Electronic Communications Policy"), that was applicable to Asher during her employment.

10. The Electronic Communications Policy provided (among other things) as follows: "The Systems provided by the Company, the associated equipment and software, and all the Electronic Communications transmitted by, stored, or received on such Systems, are to be used for Company business and shall remain at all times the exclusive property of the Company."

11. That Electronic Communications Policy also clearly stated that employees have no expectation of privacy when using "Company Systems," which included company-provided laptop computers:

> Your use of Company Systems constitutes your consent to such access, monitoring, disclosure, transfer, deletion, and/or copying by the Company. Consequently, **you should not expect privacy or confidentiality** in anything you create, download, display, store, send, or receive on Company Systems**, even if it has been deleted or is marked "confidential," "private," "personal," "privileged," or other words or phrases intended to convey it is private.** If you wish to avoid Company access to and review of personal communications, documents, files, or data, you should not use Company Systems for personal purposes or save personal material on Company Systems.
>
> (emphasis added).

12. At all relevant times, Defendants also maintained Procedures for Separating Employees ("Procedures for Separating Employees"), which applied to Asher.

13. The Procedures for Separating Employees, as of the time of Asher's termination for cause provided as follows: "Upon separation from the Company for any reason, employees are required to return to the Company all Company-owned property, including . . . computers and related equipment and files."

14. At all relevant times, the Electronic Communications Policy and Procedures for Separating Employees were contained in the employee handbook, which applied to employees of Fox subsidiaries, including NWCD.

15. Asher signed acknowledgments of the employee handbook in which she confirmed her review and understanding of the policies in the employee handbook, including as recently as July 9, 2025.

16. Asher was on notice and aware that she had no expectation of privacy with respect to her use of Fox and/or NWCD computer systems, the Laptop, or any other company-provided equipment.

17. Asher was on notice and aware that the Laptop and any other company-provided equipment was, at all times, the property of Fox and/or NWCD.

18. Following the termination of her employment, Asher was unconditionally required to return to Defendants all company property (including, without limitation, the Laptop) in her possession, custody, or control.

**<u>Asher Is Wrongfully Failing to Return the Laptop</u>**

19. Since the termination of her employment and as of the date of this filing, Asher has not returned the Laptop to Defendants. Upon information and belief, as of the date of this filing, Asher continues to retain the Laptop within her possession, custody, or control.

20. Upon information and belief, Asher is retaining the Fox Laptop within her possession, custody, or control because, despite Defendants' ownership of the Laptop and the lack of any reasonable expectation of privacy Asher had with respect to her use of the Laptop, she believes she has personal information on the Laptop related to her litigation against Fox and NWCD and/or otherwise.

21. Following the effective termination of Asher's employment, on or about June 12, 2026, Defendants (through counsel) informed Asher (through her counsel) that Asher had not returned the Laptop, and requested that Asher promptly return all company property, including the Laptop, to Defendants. Defendants informed Asher (through the parties' respective counsel) that they would send pre-paid shipping materials for Asher to return all company-property still in her

possession, custody, or control upon confirmation of Asher's current mailing address.

22. On or about June 17, 2026, Defendants again asked Asher (through their respective counsel) to confirm Asher's current mailing address to facilitate the prompt return of the Laptop and any other company property in Asher's possession, custody or control.

23. On or about June 18, 2026, Asher (through her counsel) acknowledged that the Laptop Asher continues (as of the date of this filing) to maintain in her possession, custody, or control is Defendants' property.

24. On or about July 16, 2026, Defendants (through counsel) again asked Asher (through her counsel) to return the Laptop to Defendants.

25. On or about July 20, 2026, Defendants mailed a pre-paid box and shipping label to Asher's most recent home address then in their records for Asher to return the Laptop.

26. On or about July 27, 2026, Asher (through her counsel) stated that she would not return the Laptop to Defendants without an agreed-upon set of conditions and costly protocols, because Asher believes she has personal, attorney-client privileged material on the Laptop.

27. Despite Asher's unconditional obligation to return the Laptop to Defendants following the termination of her employment, and with knowledge of

Defendants' demands for her to return the Laptop, Asher has not returned the Laptop to Defendants as of the date of this filing.

28. Upon information and belief, Asher has accessed and/or used the Laptop and information on it (or permitted such access or use on her behalf) Laptop wrongfully for her own personal purposes (including, without limitation, since the termination of her employment).

29. Defendants have suffered and will continue to suffer damages as a result of Asher's continued wrongful and unlawful retention of the Laptop in her possession, custody, or control, including but not limited to, the monetary value of the Laptop, depriving Defendants from accessing the Laptop (including any confidential and other business information contained on it), and Defendants' inability to use the Laptop for any other purpose Fox and/or NWCD may deem proper.

## COUNT I – COMMON LAW CONVERSION

30. Defendants repeat and reallege the allegations of the foregoing Paragraphs 1-29 of these Counterclaims as if fully set forth herein.

31. At all times relevant hereto, Defendants have been the owners of the Laptop currently in Asher's possession, custody, or control, and the Laptop is Defendants' property.

32. Asher was unconditionally required to return the Laptop promptly following the termination of her employment and has not done so, despite multiple requests from Defendants to return it.

33. Since the termination of her employment, Asher has wrongfully exercised control or dominion over the Laptop by retaining it within her possession, custody, or control.

34. As a direct, proximate, and foreseeable result of Asher's conversion of Defendants' property (i.e., the Laptop), Defendants have and continue to sustain damages since at least June 5, 2026, including but not limited to, the loss of access to, and use of, the Laptop that remains in Asher's possession, custody, or control, the monetary value of the Laptop, and costs incurred to recover the Laptop, in an amount to be determined at trial.

**COUNT II – STATUTORY CONVERSION (MCL § 60.2919a)**

35. Defendants repeat and reallege the allegations of the foregoing Paragraphs 1-29 of these Counterclaims as if fully set forth herein.

36. Michigan Compiled Laws § 600.2919a ("MCL § 600.2919a") defines a civil claim for statutory conversion as "Another person's stealing or embezzling property or converting property to the other person's own use."

37. MCL § 600.2919a also provides: "A person damaged . . . may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney

fees," "in addition to any other right or remedy the person may have at law or otherwise."

38. Asher has rebuffed Defendants' multiple attempts to collect the Laptop from Asher. As of the date of this filing, the Laptop remains in Asher's possession, custody, or control.

39. Asher has wrongfully retained, and upon information and belief, has accessed and/or used the Laptop for her own personal purposes, including without limitation, with respect to accessing files, communications, and other materials related to Fox's and/or NWCD's business and/or in connection with her litigation against Fox and NWCD.

**WHEREFORE**, Defendants/Counter-Plaintiffs Fox Television Stations, LLC and New World Communications of Detroit, Inc., respectfully request that the Court:

a. Enter an order directing Plaintiff/Counter Defendant Taryn Asher to return to Defendants the Laptop (as defined above) without making any modifications to (or removing any information from) it and all other company property in Asher's possession, custody, or control, on a date no later than five (5) business days after the date of the Court's order;

b. Award Defendants monetary damages in an amount to be proven at trial resulting from, or otherwise related to, Asher's wrongful retention and conversion of the Laptop;

c. Award Defendants treble damages pursuant to MCL § 60.2919a;

d. Award Defendants their attorneys' fees and costs associated with bringing these Counterclaims (including, without limitation, under MCL § 60.2919a); and

e. Award Defendants any such other and further relief as this Court deems just and proper.

Dated: August 14, 2026

Respectfully submitted,

*<u>/s/ Ami Wynne</u>*
Ami Wynne
Stephanie L. Sweitzer (P66376)
Amanda Witt
Morgan, Lewis & Bockius LLP
110 N. Wacker Drive, Suite 2800
Chicago, Illinois 60606
Phone: (312) 324-1000
ami.wynne@morganlewis.com
stephanie.sweitzer@morganlewis.com
amanda.witt@morganlewis.com

*Counsel for Defendants/Counter-Plaintiffs Fox Television Stations, LLC and New World Communications of Detroit, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2026, I electronically filed *Defendants' Answer and Affirmative Defenses to First Amended Complaint and Counterclaims* with the Clerk of the Court using the CM/ECF system.

*/s/ Ami Wynne*
Ami Wynne